In re ANCHOR GAMING SECURITIES LITIGATION.

This Document Relates to: All Actions.

No. CV–S–97–1751–DAE(RJJ).

United States District Court,
D. Nevada.

Jan. 6, 1999.

G. Mark Albright, Albright, Stoddard, Warnick & Albright, Las Vegas, NV, for Grossman, Robin, plaintiff.

Abbey Gardy & Squitieri, LLP, Mark C. Gardy, New York City, Bernstein Litowitz Berger & Grossman LLP, Daniel L. Berger, New York City, Rabin & Peckell LLP, I. Stephen Rabin, New York City, for plaintiffs.

Dennis L. Kennedy, Suvinder S. Ahluwalia, Lionel Sawyer Collins, Las Vegas, NV, Boris Feldman, David S. Steuer, Wilson Sonsini Goodrich Rosati, Palo Alto, CA, for Anchor Gaming, Stanley E. Fulton, Geoffrey A. Sage, Elizabeth Fulton Jones, Stuart D. Beath, Garret A. Scholz, Michael B. Fulton, Michael D. Rumbolz, Glen J. Hettinger, defendants.

Jules Brody, Stull, Stull & Brody, New York City, for movants.

Douglas R. Britton, Weiss & Yourman, Las Vegas, NV, for movants Annbeth Winters, James Blom, Armand W. Gehring, Stephen Jassby, Michael Stansbury, & Ernestine Tabrah.

## *ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; DISMISSING CONSOLIDATED AMENDED COMPLAINT WITHOUT PREJUDICE*

DAVID ALAN EZRA, District Judge.

The court heard Defendants' Motion on December 9, 1998. Mark Albright, Esq., Brian P. Murray, Esq., and Robert S. Gans, Esq., appeared at the hearing on behalf of Plaintiffs; Dennis Kennedy, Esq., David S. Steuer, Esq., Seth Aronson, Esq., and William Cooper, Esq., appeared at the hearing on behalf of Defendants. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS Defendants' Motion to Dismiss.

### *BACKGROUND*

This is a securities class action arising out of the secondary public offering of 1.8 million shares of Anchor Gaming Corp. ("Anchor") common stock. Plaintiffs filed this action on behalf of those who purchased or acquired Anchor common stock pursuant to the registration statement and prospectus ("Prospectus") filed with the Securities and Exchange Commission ("SEC") in connection with the secondary public offering, effective on or about October 14, 1997. The Defendants include Anchor; various individuals, including Anchor's CEO and other directors and/or officers (collectively the "Individual Defendants"); and, the underwriters of the secondary offering, BT Alex. Brown Incorporated, Raymond James & Associates, Inc., and Morgan Stanley Dean Witter (collectively the "Underwriter Defendants"). Plaintiffs allege that Defendants are liable for misstatements and omissions in the Prospectus in violation of the Securities Act of 1933.

Anchor is a diversified gaming company, headquartered in Las Vegas, Nevada. Anchor develops and distributes proprietary games, operates a gaming machine route in Nevada, and two casinos in Colorado. In 1994, Anchor became a publicly-held company pursuant to an initial public offering ("IPO") of 2.75 million shares of common stock. Since the IPO, Anchor's revenues and earnings have increased substantially along with the market price of its common stock.

Much of Anchor's growth could be attributed to its entry in September of 1996 into a strategic alliance with International Gaming Technology ("IGT"), the largest manufacturer of computerized gaming casino products. This alliance was designed to enhance Anchor's ability to develop and distribute proprietary gaming devices. Proprietary games consist of gaming machines that either have been developed by Anchor, or which Anchor has acquired the exclusive rights to market to unaffiliated casinos. Proprietary games are designed to provide casinos with a higher win per machine than their existing gaming devices, while also implementing concepts and devices to increase customer playing levels.

Anchor's alliance with IGT resulted in a joint venture (the "Joint Venture") to develop, integrate, and distribute wide area progressive ("WAP") proprietary game systems. These WAP systems allow Anchor to link individual slot machines electronically among multiple locations, with a percentage of each coin deposited into every machine on the

network contributing to a common jackpot. These devices build higher level jackpots more quickly than traditional devices, thus creating a greater incentive for the gambler.

On September 2, 1997, Anchor announced that it had filed its Prospectus with the SEC covering an offering of 1.8 million shares of common stock to be offered by certain shareholders, including CEO Stanley E. Fulton and other Fulton family members. These shares represented "less than 30% of the Fulton family holdings in Anchor Gaming." The Prospectus became effective on October 14, 1997.

Although Plaintiffs allege that the price of Anchor common stock dropped significantly following this announcement, Plaintiffs also contend that Defendants acted quickly to stem this decline. For instance, Anchor issued a press release on September 10, 1997 which indicated that "analysts' estimates for the current quarter's profits [through September 30, 1997] may be conservative." Specifically, Anchor attributed these results to the installation of "approximately 2,700 of the highly successful Wheel of Fortune machines as of August 30, 1997." Following Anchor's announcement, its stock price closed at a new record high of $90.50 per share on September 18, 1997.

On December 3, 1997, Anchor issued a press release stating that "it is likely that earnings for the quarter ending December 31, 1997 may not meet analysts' expectations, although this is not certain."[1] The press release noted that while Anchor did not have sufficient data to arrive at firm conclusions, "it is possible that the Anchor/IGT Joint Venture may be experiencing seasonality in its results of operations." The release also noted that Anchor would have to record "an unforeseeable one-time charge resulting from an unresolved matter with a third party vendor to the Anchor/IGT Joint Venture."

1. Defendants quickly point out that Anchor's actual results for the quarter ending December 31, 1997 were, in fact, in line with analysts' prior consensus estimates.

2. The Motion to Dismiss was filed on behalf of Anchor and the Individual Defendants and was joined by BT Alex. Brown. Although underwrit-

On December 4, 1997, the day after Anchor's announcement, the price of Anchor stock fell to $52.50 per share. The next day, December 5, 1997, Plaintiffs filed this lawsuit. Defendants move to dismiss Plaintiffs' Consolidated Amended Class Action Complaint.[2]

## STANDARD OF REVIEW

A motion to dismiss will be granted where the plaintiff fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A complaint should not be dismissed "unless it appears beyond doubt that plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.) (quoting *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.1989)) (further citations omitted), *cert. denied*, 506 U.S. 999, 113 S.Ct. 599, 600, 121 L.Ed.2d 536 (1992). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *Id.*

To the extent, however, that "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(b); *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1507 (9th Cir.1990).

## DISCUSSION

Defendants argue that Plaintiffs fail to state a claim under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 and to plead with particularity pursuant to Federal Rule of Civil Procedure 9(b). Liability under section 11 of the Securities Act attaches if "any part of the registration statement, when such part becomes effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).

ers other than BT Alex. Brown were named in the action, they apparently have not been served with the Consolidated Amended Class Action Complaint. Therefore, pursuant to Federal Rule of Civil Procedure 4(m), the court hereby dismisses Raymond James & Associates, Inc. and Morgan Stanley Dean Witter.

"The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1403–04 (9th Cir.1996) (citation omitted), *cert. denied*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). No scienter is required for liability under § 11. *Id.* at 1404. Section 12(a)(2) imposes civil liability against any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. . . ." 15 U.S.C. § 77l(a)(2).

Section 15 of the Securities Act imposes joint and several liability upon "[e]very person who . . . controls any person liable under section[s] 11 or 12." 15 U.S.C. § 77o. To state a claim for control person liability, a plaintiff "must allege that 1) the individual defendants had the power to control or influence [the company], and 2) the individual defendants were culpable participants in [the company's] alleged illegal activity." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). Violation of section 15 is predicated upon violation of section 11 or 12.

■ The parties strongly disagree as to whether the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to Plaintiffs' claims. Despite Plaintiffs' insistence that "applying Rule 9(b) to a Securities Act claim violates common sense," many courts, including the Ninth Circuit, have held that Rule 9(b) applies to Section 11 or 12 claims that sound in fraud.[3] *In re Stac*, 89 F.3d 1399, 1404–05 (9th Cir. 1996) ("We now clarify that the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when . . . they are grounded in fraud"); *Melder v. Morris*, 27 F.3d 1097, 1100 n. 6 (5th Cir.1994) (applying Rule 9(b) to §§ 11 and 12 claims grounded in fraud); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3rd Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992) ("plain language [of Rule 9(b)] clearly encompasses §§ 11 and 12 claims based on fraud"); *Sears v. Likens*, 912 F.2d 889, 892–93 (7th Cir.1990) (applying Rule 9(b) to 1933 Securities Act claims sounding in fraud). Thus, the first question that must be addressed is whether Plaintiffs' claims are grounded in fraud.

■ Five of the seven original federal complaints filed against Anchor included Section 10(b) claims under the Securities Exchange Act of 1934. In contrast to Section 11 of the Securities Act, Section 10(b) requires scienter and covers statements made not only in the registration statement or prospectus but also in other documents and in oral communications. *In re Stac*, 89 F.3d at 1404. While Plaintiffs' Consolidated Amended Class Action Complaint drops the Section 10(b) claims and avoids using the words "fraud" or "fraudulent," the gravamen of the Complaint clearly alleges fraudulent concealment or misrepresentation of material information. For instance, the Complaint states that "certain of the Individual Defendants *decided to take advantage of the rising price* of Anchor common stock by selling a substantial portion of their equity stake in the Company to the public." Plaintiffs also allege that while "the price of stock dropped significantly following this announcement, *defendants acted quickly to stem this decline*" by issuing a positive press release. Throughout the Complaint, Plaintiffs repeatedly highlight Defendants' stock sales, describing how "Anchor's announcement [of the Secondary Offering] had the desired effect" of driving up the price of the Company's stock. Finally, the Complaint states that "[w]ith the market price of Anchor common stock remaining at near record levels, and the material adverse facts with respect to seasonality of the Joint Venture's business

---

**3.** Plaintiffs also argue that if Rule 9(b) applies to Section 11 claims, it only applies when the complaint also contains a Section 10(b) claim. The Ninth Circuit's discussion of Rule 9(b)'s application to Section 11 claims in *In re Stac*, however, does not set forth or imply such a limitation. 89 F.3d at 1404–05. Therefore, the court concludes that Rule 9(b) may apply in the absence of a Section 10(b) claim, as long as the complaint sounds in fraud.

and its significant dispute with a vendor *still concealed,* certain of the Individual Defendants ... decided to sell a substantial portion of their equity stake in the Company." Notwithstanding the absence of express fraud allegations, the Complaint is rife with insinuations and suggestions that Defendants purposefully omitted and misstated material information, intending to benefit therefrom.

These allegations of purposeful concealment and intentional misconduct amount, if true, to fraud. Plaintiffs' Complaint *could* have been drafted to simply allege, without embellishment, that the Prospectus contained materially false or misleading statements or omissions. However, Plaintiffs chose to do more. By including allegations of fraudulent misconduct, Plaintiffs brought the burden of Rule 9(b) upon themselves. As the Ninth Circuit has stated:

> Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints "as a pretext for the discovery of unknown wrongs," to protect professionals from the harm that comes from being subject to fraud charges, and to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis."

*In re Stac,* 89 F.3d at 1405 (quoting *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985)). The court, therefore, concludes that despite Plaintiffs' careful attempt to avoid use of the term "fraud," the Consolidated Amended Class Action Complaint nonetheless clearly sounds in fraud. Thus, Defendants are entitled to the protections of Rule 9(b).

Because the court has concluded that Rule 9(b) applies to Plaintiffs' claims, it must be determined whether Plaintiffs' Complaint meets the requirements of Rule 9(b). The Ninth Circuit has detailed Rule 9(b)'s requirements in the securities fraud context:

> What makes securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood. In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made. This can be done by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.

*In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994) (en banc).

▬ In this case, Plaintiffs' allegations fail to meet the requirements of Rule 9(b). Plaintiffs allege that Anchor's Prospectus contained three false or misleading statements or omissions. First, Plaintiffs allege that Defendants failed to disclose that Anchor's business model "had undergone a fundamental change and would henceforth pay its manufacturers a percentage of revenue and receive a fixed payment for placing its machines in casinos" rather than pay the manufacturers a fixed rate and share in the revenue from the casino. Second, Plaintiffs contend that the statement in the Prospectus regarding "Seasonality" was false and misleading:

> The Company's operations as a whole are not subject to significant seasonal variations. However, in general, the highest level of business activity at its Colorado casinos occur during the tourist season from July to October of each year.
>
> In addition, operations at the Colorado casinos during the winter months could be

significantly affected by weather and road conditions in Colorado. The Company's proprietary games operations typically have their highest levels of business during the summer tourist season when its casino customers experience heavier tourist traffic.

Third, Plaintiffs allege that the Prospectus failed to reveal that, at the time of the Secondary Offering, "Anchor was embroiled in a significant dispute with a vendor to the Joint Venture and that, as a result of this dispute, the Company was required to record a charge to earnings that would reduce Anchor's earnings by more than $400,000, or approximately $0.03 per share." Thus, Plaintiffs argue that the section in the Prospectus entitled "Litigation" was false and misleading. This section stated that:

> From time to time the Company is a defendant in various lawsuits in routine matters incidental to its business. Management does not believe that the outcome of any such litigation will have a material effect on Anchor.

With respect to the second and third allegations, Plaintiffs do exactly what the Ninth Circuit has held to be insufficient. That is, Plaintiffs take the information disclosed in Anchor's December 1997 press release—that the Company "may be experiencing seasonality in its results of operations" and that it will "record an unforeseeable one-time charge resulting from an unresolved matter with a third party vendor"—and say that the "later, sobering revelations make the earlier, cheerier statement a falsehood." *In re Glen-Fed*, 42 F.3d at 1548. Plaintiffs simply have not alleged with particularity why the Prospectus' statements regarding "Litigation" and "Seasonality" were false or misleading *when made*. Specifically, Plaintiffs neither allege facts that would substantiate their contention that a *material* vendor dispute (and/or any threatened or actual litigation) existed prior to the effective date of the Prospectus nor allege facts that would support a finding that the Company's operations

(other than those in Colorado or those relating to the proprietary games) were subject to seasonality as of the time the Prospectus was released. Rule 9(b) requires more than conclusory fraud-by-hindsight allegations.

With respect to the business model allegations, Plaintiffs offer no facts to support their conclusion that Anchor's business model underwent a dramatic transformation. Plaintiffs merely allege that Anchor's competitors were entering the field with competing games and that "no longer would Anchor have a monopoly and the ability to dictate terms on both ends of the business." Moreover, Anchor points to information revealed during the October Gaming Conference, held on October 14–16, 1997 regarding competitive machines as a basis for these allegations. Anchor's Prospectus became effective on October 14, 1997. Thus, any information revealed during this conference cannot serve to establish that Anchor's information regarding its business model, as of the effective date of the Prospectus, was false or misleading.

Even if the court were to find that Plaintiffs' allegations satisfied Rule 9(b), these allegations still would not state a claim under Federal Rule of Civil Procedure 12(b)(6). First, the amount involved in the vendor dispute is not material, as a matter of law.[4]

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote ... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). As a result of the vendor dispute, Anchor recorded a charge to earnings of $400,000 or $0.03 per share. Plaintiffs do not dispute that the $0.03 charge reflects 2.5% of Anchor's quarterly earnings per share ($1.20) and 0.5% of Anchor's total fiscal year 1998[5] earnings per share ($5.20).

---

4. The court can properly consider the question of materiality on a motion to dismiss. *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3rd Cir.1996).

5. Anchor's fiscal year 1998 ended June 30, 1998.

Although the issue of materiality is a mixed question of law and fact, courts have held that certain small amounts are immaterial, as a matter of law. In fact, one of the cases relied upon by Plaintiffs, *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734 (N.D.Cal. June 8, 1994), supports this analysis. The *Mathews* court found an earnings per share difference of $0.01, from $0.15 to $0.14, immaterial. *Id.* at *6. In so holding, the court also recognized that other "[c]ourts have ... found that allegedly fraudulent transactions which are under one or two percent of net operating revenues are immaterial." *Id.* at *7. Likewise, the Third Circuit, in *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3rd Cir.1996) affirmed the lower court's dismissal of a complaint on the grounds that the loss alleged was quantitatively immaterial. *See generally,* Loss & Seligman, *Fundamentals of Securities Regulation* 137–41, 479–80 (1995) (quantitative materiality analysis is generally appropriate, though not when "such matters as a conflict of interest or criminal violations are at issue"); *see also, Ferber v. Travelers Corp.*, 802 F.Supp. 698, 708 (D.Conn.1992) (omission of extent of second mortgage not material in relation to overall real estate, investment, and asset portfolios); *In re Convergent Technologies Second Half 1984 Sec. Litig.*, No. C–85–20130–SW, 1990 WL 606271, at *22–23 (N.D.Cal. Jan. 10, 1990) (holding that "in [the] context of meeting net current operations well above market expectations and then recognizing a huge one time loss, a difference of a cent or two per share is not material."); *Pavlidis v. New England Patriots Football Club, Inc.*, 675 F.Supp. 688, 692 (D.Mass.1986) (increase of less than 1% of yearly operating revenue was not material).

Plaintiffs also argue that both the December 3, 1997 press release and the resulting decline in stock price indicate that the vendor dispute was material. However, at the time of the press release, it was unclear what impact the unresolved matter with the third-party vendor would have on earnings. Moreover, the vendor dispute was one of several factors mentioned in the release. Plaintiffs

cite no support, and the court has found none, for their argument that the inclusion of information in a press release constitutes an admission of materiality. Although the stock price dropped after Anchor issued the press release, there is no evidence that this decline was related (or if so, how?) to the information regarding the vendor dispute. In the absence of such evidence, the court will not imply materiality.

Second, Plaintiffs fail to state a claim with respect to the seasonality of Anchor's operations. The Prospectus stated that "[t]he Company's operations *as a whole* are not subject to significant seasonal variations" (emphasis added). The Prospectus acknowledges, however, that "[t]he Company's proprietary games operations typically have their highest levels of business during the summer tourist season ..." Plaintiffs' assertion that the Joint Venture (part of the proprietary games operations) "was experiencing a significant seasonal slowdown in business, and that the seasonal slowdown in business would continue through the quarter ending December 31, 1997" is not inconsistent with the statements made in the Prospectus. Absent a reasonable expectation that a known trend or uncertainty will have a material impact, there is no duty of disclosure. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir.1998). Plaintiffs here have failed to allege how, just two weeks into the quarter, Defendants would have been able to recognize an adverse trend (seasonality) or that they would have had a reasonable expectation that the trend would have a material impact.[6]

Finally, with respect to the alleged change in Anchor's business model, the court concludes that Plaintiffs have failed to state a claim. As discussed above, Plaintiffs cannot rely on information disclosed during the October 14–16, 1997 Gaming Conference to support their contention that Defendants failed to disclose a material change in Anchor's business model. For the same reasons, Plaintiffs also may not rely on the October 27, 1997 announcement that Alliance Gaming

---

6. In fact, Defendants point out that one of the factors mentioned in the December 3, 1997 press release, the major snowstorms in Colorado, did not occur until late in October (after the Prospectus had been issued).

Corporation had entered into an agreement with Anchor to manufacture two Anchor games. Put simply, this after-the-fact "evidence of this change in business plan" does not indicate that Anchor's business model had materially changed at the time the Prospectus became effective.

Furthermore, the language in the Prospectus clearly warned investors of the risks inherent in Anchor's proprietary games operations:

> The Company places its proprietary games in casinos at no cost to the casinos under short-term arrangements, making these games susceptible to replacements due to pressure from competitors, changes in economic conditions, obsolescence, and declining popularity.

> Introduction of new proprietary games involves significant risks, including whether the Company will be able to place its games with casinos, the economic terms on which casinos will accept the machines, the popularity of the games with gaming patrons, and whether a successful game can maintain its popularity over the long term. If the company is not successful in introducing new games, the effect on Anchor would be adverse.

Therefore, the court concludes that Plaintiffs' alleged omissions and misstatements fail either to comply with the requirements of Federal Rule of Civil Procedure 9(b) or to state a claim under Rule 12(b)(6). Because Plaintiffs' Section 11 and 12(a)(2) claims fail, so also do the Section 15 claims.

## CONCLUSION

For the reasons stated above, the court GRANTS Defendants' Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint and DISMISSES Plaintiffs' Complaint without prejudice.

IT IS SO ORDERED.