Richard M. RHODES, individually and on behalf of all others similarly situated, Plaintiffs,

v.

OMEGA RESEARCH, INC.; William R. Cruz; Ralph L. Cruz; Bancboston Robertson Stephens; Lehman Brothers; and Hambrecht & Quist Defendants.

No. 98–0174–CIV.

United States District Court, S.D. Florida.

March 1, 1999.

Michael Pucillo, Wendy H. Zoberman, Burt & Pucillo, LLP, W. Palm Beach, FL, Andrew Barroway, Schiffrin, Craig & Barroway, LLP, Bala Cynwyd, PA, Ralph Stone, Esq., Shalov, Stone & Bonner, New York City, for Plaintiffs.

Eugene E. Stearns, Richard B. Jackson, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitteron, P.A., Miami, FL, for Defendants William R. Cruz, Ralph L. Cruz and Omega Research, Inc.

Hilarie Bass, Greenberg, Traurig, P.A., Miami, FL, Sara Brody, Stephen M. Kanster, Amy M. McNamer, Brobeck Phleger & Harrison, LLP, San Francisco, CA, for BancBoston Robertson Stephens, Lehman Brothers and Hambrecht & Quist.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS

LENARD, District Judge.

THIS CAUSE is before the Court on two motions to dismiss the Amended Complaint, filed by (1) Defendants Omega Research, Inc., William R. Cruz, and Ralph L. Cruz ("Omega Defendants"), on August 18, 1998; and (2) Defendants BancBoston Robertson Stephens, Lehman Brothers, and Hambrecht & Quist ("Underwriters"), on July 1, 1998. The Court having considered the motions, the responses and the record in this case, finds as follows.

### I. Introduction

In the Amended Complaint, Plaintiffs allege in Count I that all Defendants violated section 11 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o (1994) ("Securities Act"); in Count II that all Defendants violated section 12(A)(2) of the Securities Act; and in Count III that individual Defendants violated section 15 of the Securities Act.

Omega Research, Inc. was founded by Ralph L. Cruz and William R. Cruz in 1982, and is headquartered in Miami, Florida. It designs and sells investment analysis computer software. One of Omega's products, TradeStation, pioneered the concept of allowing investors to use a personal computer to create investment models which, among other things, allow for the automation of investment strategies in various markets. Omega also manufactures other computer-based statistical modeling products, including OptionStation and SuperCharts. These products are used by individual investors, so-called "day traders," and by institutional investors. These products are also sold and marketed under licencing agreements with other companies, notably with Dow Jones Markets, under various names, including "Dow Jones TradeStation." The licencing agreement with Dow Jones extends at least until the year 2002, and constitutes a major source of current and expected revenue for Omega.

In September, 1997, Omega undertook an initial public offering. The Registration Statement and Prospectus ("Prospectus") filed in connection with the initial public offering of Omega's common stock was declared effective by the Securities and Exchange Commission on September 30, 1997. In the offering, Omega sold 2,758,108 shares of common stock and William R. Cruz and Ralph L. Cruz, then the only beneficial shareholders of Omega, sold a total of 1,166,892 shares. The shares sold for $11 per share and the offering was fully subscribed.

The Prospectus filed in conjunction with the offering and attached to the Amended Complaint is a detailed and thorough document, replete with cautionary warnings describing the high degree of risk involved with this business. The introductory paragraph describes the planned offering and states, "The Company will not receive any of the proceeds from the sale of the shares being sold by the Selling Shareholders."[1] Then, in bold type, the first page announces:

"The Common Stock offered hereby involves a high degree of risk. See 'Risk Factors' beginning on page 7."

(Prospectus at 1.) Beginning on page seven, the Prospectus outlines numerous risk factors involved in any decision to invest in Omega. Among the most important were: (1) the company's short history and lack of track record; (2) dependence on few products appealing only to a small group of

---

[1] Elsewhere, the Prospectus describes in detail the benefits that would accrue to the "current shareholders." (See Prospectus at 16.) This included notice that offering proceeds would be used in "repayment of a short-term bank loan used to fund payment of a distribution of accumulated S corporation earnings to the Company's current sharehold-

ers." (Prospectus at 5.) In significant detail, the Prospectus goes on to describe capitalization and dilution—in addition to the direct discussion of "control by principal shareholders, officers and directors," i.e., the Cruz brothers, which occurs at page 16. (Prospectus at 16.)

potential customers; (3) the interdependence of Omega's products with other computer software products, including the underlying computer operating system and potential problems within the Windows operating system; (4) the difficulty in predicting revenue streams because of market elasticity of demand; (5) the company's liberal return policy, which could generate negative revenue and impact sales; (6) the dependence of ongoing licencing agreements, notably with Dow Jones, for future revenue; (7) the problems associated with recent growth, including various staffing issues and the potential for customer service problems; (8) the risk of competition, including the risk that low barriers to entry in the market could lead to future competition; (9) risks of defects in current or future products; and, not coincidentally (10) the risk of litigation. These risks are only a few of those outlined in great detail.

In addition to the information on risk outlined above, the Prospectus contained extensive discussion of the financial position of the company, the proposed use of proceeds from the sale of stock, and explicit disclosures regarding benefits that certain shareholders would receive as a result of the offering. *See* note 1, *supra*. These disclosures included a discussion of the "S corporation," distribution of earnings in relation to the relevant Internal Revenue Code provisions (*See* Prospectus at 15–16), and the explicit disclosure that the revenue generated by the sale would inure to the benefit of the existing shareholders. (*See* Prospectus 19.)

The public received information about Omega and the initial public offering from sources other than the Prospectus.[2] (*See* Am. Compl. ¶¶ 39–47.) Plaintiffs allege, for example, that officers of Omega made "roadshow" presentations, where they projected the image of a dynamic and successful corporation with prospects for increased future revenues and earnings. (Am. Compl. ¶¶ 39–43.) On October 27, 1997, Omega reported its third quarter financial results including earnings of $0.09 cents per share. (Am. Compl. ¶ 41.) Plaintiffs allege that on that same day, October 27, 1997, all three Underwriters—BancAmerica Robertson Stephens,[3] Lehman Brothers, and Hambrecht & Quist—issued reports recommending that investors "buy" Omega Research stock, and predicting Omega would earn between $0.06 and $0.07 cents per share in each of the third and fourth quarters of fiscal year 1997. (Am. Compl. ¶ 40.)

Thus the Company appeared to have beaten earnings expectations by $0.02–0.03 cents per share. Thereafter, Plaintiffs allege, the Underwriter Defendants issued so-called "booster shot" reports. Although Plaintiffs reference but do not attach these reports, Underwriter Defendants allegedly predicted earnings between $0.07–$0.08 cents per share for the fourth quarter of fiscal year 1997, and provided generally positive assessments of Omega. (Am. Compl. ¶ 42.)

Plaintiffs infer that this series of predictions was materially misleading. They allege that starting on January 6, 1998, the Underwriter Defendants and Omega separately announced lower earnings estimates. Plaintiffs infer, although do not state explicitly,[4] that these announcements

---

**2.** While the Plaintiffs allude to such statements in the Amended Complaint, and include certain excerpts, they do not attach these. Plaintiffs do include excerpts from certain electronic mail messages posted on an America Online bulletin board devoted to Omega Research products. These excerpts purport to detail certain technical glitches and irregularities with the Company's products. (*See* Am. Compl. ¶ 30.)

**3.** BancAmerica Robertson Stephens has since changed its name to BancBoston Robertson Stephens. (*See* Notice of Name Change, filed November 13, 1998.)

**4.** Defendants contend the indirect and inferential style Plaintiffs' employ to allege these "materially misleading" allegations is an elaborate method of avoiding reference to "fraud" or "fraudulent conduct." As will be discussed *infra*, and as Defendants argue throughout the motions, this is because where such allegations "sound in fraud," the strict pleading requirements of Federal Rule of Civil Procedure 9(b) apply.

somehow demonstrate the previous earnings estimates were "materially" misleading. In early January, 1998, Omega announced it expected to earn approximately $0.02 to $0.04 cents per share for the fourth quarter of 1997, and shortly thereafter each of the Underwriter Defendants issued earnings estimates that corresponded to these figures. (Am. Compl. ¶¶ 45–46.) Thus, between the third and fourth quarters of 1997, earnings appear to have dropped between $0.05–0.07 cents per share.

The initial public offer raised, in Plaintiffs' estimate, approximately $46 million. (Am. Compl. 2.) After trading above the initial $11 per share price, the stock price declined.[5] Less than three weeks after the lowered-earnings announcements, Plaintiffs filed suit on January 28, 1998. On April 23, 1998, discovery was stayed pursuant to the automatic stay provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 772(b)(1). An Amended Complaint followed on June 1, 1998, claiming injury on behalf of all persons who purchased Omega stock from October 1, 1997, through January 6, 1998 (the "class period").

In the Amended Complaint, Plaintiffs allege the Prospectus is materially false and misleading because: (1) it does not disclose the trend of decline in market sales (Am. Compl. ¶¶ 14–15, 20–22) and does not disclose technical problems with the company's products (Am. Compl. ¶¶ 15–18, 23–31); (2) it does not disclose that the company's products are not "year 2000 compliant," (Am. Compl. ¶ 32); (3) it does not disclose product return problems (Am. Compl. ¶ 33); (4) it does not disclose product delays (Am. Compl. ¶ 34); (5) it inadequately discloses the Cruz brothers'

stake in the offering (Am. Compl. ¶¶ 35–36); and (6) it unreasonably priced the stock during the initial public offering (Am. Compl. ¶ 37). In addition, Plaintiffs allege more broadly that the Prospectus inadequately discloses the risk involved in investing in these securities. (Am. Compl. ¶ 38.) Finally, Plaintiffs allege the "road show" and other reports produced by the Company and the Underwriters materially misled investors. (Am. Compl. ¶¶ 39–43.)

All Defendants now seek to dismiss the Amended Complaint in its entirety, arguing Plaintiffs have failed to state any claim upon which relief may be granted. Fed. R.Civ.P. 12(b)(6).

## II. Standard of Review

In evaluating a motion to dismiss, a district court must view the complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint may not be dismissed for failure to state a cause of action "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bank v. Pitt*, 928 F.2d 1108, 1111–12 (11th Cir.1991)(citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

When a complaint alleges fraud, Federal Rule of Civil Procedure 9(b) states that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

On a motion to dismiss, the court may consider documents attached to the

---

**5.** The Plaintiffs do not detail the trading price fluctuations for the period immediately following the initial public offering, nor for the period following post-offering pronouncements. They state only that the price declined to below $3.00 per share "shortly after the end of the class period." (Am. Compl. ¶ 1.) Defendants argue this omission is related to questions of standing, particularly because a majority of the Plaintiffs purchased the stock from the secondary market after the initial offering, and at prices well below the $11 offering price. Certain named Plaintiffs purchased the stock for as little as $3.0625 per share. (*See* Aff. of Anthony J. Massino, Am. Compl. Ex. A.) A number of the purported class members continued to purchase the stock during the class period even as the price dropped.

complaint or directly referred to in the complaint, and doing so will not convert the motion to one for summary judgment.[6] *See Solis–Ramirez v. United States Dept. of Justice,* 758 F.2d 1426, 1430 (11th Cir. 1985); *see also Fecht v. The Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995)("[D]ocuments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.") (internal quotation omitted). An action may be dismissed as futile when the complaint, even when amended "would fail to state a claim upon which relief could be granted." 3 *Moore's Federal Practice* ¶ 15.08[4], at 15–80 (3d ed.1998); *see Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996) ("In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion.") (citations omitted).

## III. Analysis

As Judge Moreno stated in *Harris v. IVAX Corp.,* the Securities Reform Act of 1995

> was intended to redress abusive securities litigation in which meritless claims were brought in the hope of using the discovery process to uncover evidence of fraud not alleged in the complaint. Congress heard evidence that the expense of defending such suits sometimes led defendants to agree to settlements that provided little financial benefit to the claimed victims of the fraud, but fully compensated plaintiffs' lawyers with large fee awards. The Reform Act prohibits certain kinds of securities claims and seeks to insure the disposition of baseless claims before a defendant is forced to engage in expensive, protracted· discovery.

**6.** The Court notes that additional materials, including news articles that relate to the allegations in the Amended Complaint, have been attached to the Defendants' pleadings in support of the motions to dismiss. Defendants correctly point out that materials not attached

998 F.Supp. 1449, 1452 (S.D.Fla.1998) (citations omitted); *see also* Joel Seligman, *The Private Securities Reform Act of 1995,* 38 Ariz. L.Rev. 717, 720 (1996) (discussing legislative history and congressional concerns). With this admonition, the Court first analyzes Plaintiffs' 1933 Act claims to determine whether Rule 9(b) particularity requirements need apply. Finding that these claims "sound in fraud," the Court adjudges the pleading insufficient. Further analyzing the allegations, the Court finds certain claims must be dismissed with prejudice. As no portion of the Amended Complaint survives the motions, the Court does not reach specific issues of Underwriters' liability, standing, or section 15 liability.

### A. Sections 11 and 12(a)(2) of the Securities Act of 1933

The allegations in Counts I–II claim all Defendants violated sections 11 and 12(a)(2) of the Securities Act of 1933. Section 11 allows any purchaser of a security to bring a cause of action based on material misstatements, if any part of the registration statement,

> when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . .

15 U.S.C. § 77k(a). A section 11 claim can be asserted against every person who signed the prospectus, the issuer's officers and board of directors, the underwriters of the securities offering, and any expert whose profession gives authority to that part of the registration statement he or she prepared. *See United States v. Naftalin,* 441 U.S. 768, 777–778, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979) ("The 1933 Act was

but referred to in the Amended Complaint may be considered in the context of a motion to dismiss. However, except where explicitly noted, the Court has not considered these additional materials in any way.

primarily concerned with the regulation of new offerings.").

■■■ It is settled that "[t]he plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir.1996) (citation omitted), *cert. denied sub nom. Anderson v. Clow,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *In re Stac,* 89 F.3d at 1404 (quoting *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

Under section 12(a)(2) any person who "offers or sells a security ... by means of a prospectus or oral communication" containing a materially false statement or "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77(1)(a)(2).

### 1. Whether Rule 9(b) particularity requirements apply to section 11 claims

■ When an allegation sounds in fraud, under Rule 9(b), plaintiffs must allege (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1381 (11th Cir.1997) (per curiam) (adopting in part holding of court below, No.95–405–

CIV–MARCUS, 1995 WL 931702, at *19 (S.D.Fla. Sept.22, 1995)).

■ In a securities class-action involving the initial public offering of a computer company, the Ninth Circuit recently addressed the specific issue of whether the particularity requirements of Fed.R.Civ.P. 9(b) may apply to claims brought under section 11 of the Securities Act. *See In re Stac,* 89 F.3d at 1404–05.[7] In accord with at least four other courts of appeal, the *In re Stac* court specifically held that when section 11 claims are "grounded in fraud," Rule 9(b) particularity requirements apply. *Id.* at 1404 (citing *Melder v. Morris,* 27 F.3d 1097, 1100 n. 6 (5th Cir.1994) (holding Rule 9(b) applies to 1933 Securities Act claims when they are grounded in fraud rather than negligence); *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 288 (3d Cir.1992)(observing that "the plain language [of Rule 9(b) ] clearly encompasses § 11 and § 12(2) but reserving judgment on the issue of whether the rule applies to claims that a defendant negligently violated these sections"), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *Sears v. Likens,* 912 F.2d 889, 892–893 (7th Cir.1990) (applying rule 9(b) to 1933 Securities Act claims sounding in fraud)); *and see Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996). Reasoning both that Rule 9(b) serves to give defendants notice of the wrongs charged and an opportunity to defend against such suits, and the Rule 9(b) policy of discouraging lawsuits where plaintiffs seek to "dig up" any possible claims once discovery begins should apply to section 11, the *In re Stac* court stressed such application "prohibit[s] plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." 89 F.3d at 1405 (quoting *Semegen v. Weidner,* 780 F.2d 727, 731 (9th Cir.1985)). Therefore, in the securities context, courts have required "a

---

7. Courts have consistently held that Rule 9(b) may apply to claims alleged under section 12(a)(2). *See, e.g., Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996) (al-

though Section 11 and 12(a)(2) claims do not require allegations of scienter and reliance, the claims may yet sound in fraud).

complaint making such allegations '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).[8]

### 2. Rule 9(b) Particularity Required Here

The First Circuit in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996), provided cogent discussion on whether section 11 and 12(a)(2) claims "sound in fraud," and if so, in what fashion Rule 9(b) pleading requirements may be met. A 35 year-old computer company, Digital for two years had been in deep financial trouble, facing fluctuating revenue and uncertain prospects. *See id.* at 1199. Expecting it might need to raise additional capital to remain viable, the company filed a "shelf" registration statement on March 11, 1994 to conduct a $400 million capital offering. *See id.* at 1200. A prospectus supplement followed on March 21, 1994, which stated "the company believes the [capital to be raised] is adequate to cover presently planned restructuring actions." *Id.* The offering commenced on that date and closed after one week, on March 28, 1994. *Id.* at 1206. However, less than three weeks later, on April 15, 1994, Digital announced it had decided to "accelerate [its] ongoing re-

structuring efforts" and "also [would] consider further restructuring." *Id.* In other words, it would take significant additional charges for the quarter that had just ended, and also during the year to follow, in direct contrast to the assertions made in the prospectus and supplement.[9] *See id.* at 1204–05. The Company's stock price tumbled. *See id.* at 1205. Analyzing the allegations of omissions and misstatements, the *Shaw* court emphasized that the timing of the pronouncements was problematic. *See id.* at 1209–10. The offering commenced just 11 days prior to the close of the first quarter, and the positive assessment was issued on the offering date itself. *See id.* at 1210. Because the negative announcement came less than three weeks later, just after the quarter ended, the court determined plaintiffs had stated a valid § 11 claim by alleging the prospectus contained material misstatements regarding the restructuring effort. *See id.* at 1210–1211.[10]

The *Shaw* court later analyzed Digital's argument that Rule 9(b) should apply to the complaint. Stating that fraud is not necessarily an element of either section 11 or 12(a)(2), but emphasizing that such claims "may yet sound in fraud," the court explained,

> [a]lthough the complaint does assert that defendants actually possessed the information that they failed to disclose, those allegations cannot be thought to constitute "averments of fraud," absent any claim of scienter and reliance. Oth-

---

**8.** Section 11 concerns only registration statements. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575–76, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). Therefore, any additional statements, including "roadshow" presentations, analysts' reports or statements to institutional investors (i.e. conference calls) are generally outside the reach of section 11. *See In re Stac*, 89 F.3d at 1405; *Glassman v. Computervision Corp.*, 90 F.3d 617, 623–24 (1st Cir.1996); *c.f. In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 370 (3d Cir.1993).

**9.** Furthermore, certain corporate insiders sold stock just before the subsequent announcement. *Shaw*, 82 F.3d at 1224.

**10.** The court disposed of numerous additional claims raised by the plaintiffs. After breaking down the allegations of the §§ 11 & 12(a)(2) action, the court found both plaintiffs' contention that "DEC had embarked on a risky marketing strategy that involved slashing prices and sacrificing profit margins in the hopes of increasing 'market penetration' of the company's [computer] products," and plaintiffs' claim that sales representatives were being overpaid based on 'double commissions,' to be without merit. *Shaw*, 82 F.3d at 1206–07.

erwise, any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b).

*Shaw,* 82 F.3d at 1223. The *Shaw* court went on to hold the surviving claims of material misstatements in the registration statement and prospectus did not "sound in fraud," and were therefore not subject to Rule 9(b) pleading requirements. *Id.* at 1222.

■ A balance must be struck between allowing bald allegations of material misstatements or omissions with little factual basis, on the one hand, and so tightening the requirements of pleading that Plaintiffs must plead evidence, on the other. Although Plaintiffs rely on *Shaw* to argue the claims here do not "sound in fraud," the Court must disagree. More than just "keeping certain information from the public eye," or even misrepresenting corporate strategy or intentions, as was the case in *Shaw,* Plaintiffs here allege Omega products were faulty and near technological obsolescence. While they do not say so directly, Plaintiffs imply that Omega's "all but useless" products could not keep up technologically either with the computer software market generally or the competition, and that Omega could not develop and perfect 32–bit versions fast enough to meet demand. (*See, e.g.,* Am. Compl. ¶ 24 (alleging technical problems "render the product worthless and useless.")) The looming technological obsolescence, Plaintiffs contend, stemmed from widespread use of versions of Omega products written for 16–bit operating systems, and a shift in the industry would require programs which could run on 32–bit computers. Knowing this, Plaintiffs allege, the Cruz brothers, aided by the Underwriters, engaged in a series of "outlandish" actions to swindle unsuspecting investors. Aware the Company was near failure, burdened with nearly obsolete products, Plaintiffs contend the Cruz brothers awarded themselves an enormous "S Corporation" dividend just before the offering, using the proceeds to pay this dividend. To aid this plan, Plaintiffs allege Omega engaged in sales and customer service practices which manipulated earnings and revenue data to make the company look artificially successful. As Plaintiffs' allege, the sales staff beguiled customers into keeping products until just after the offering commenced so that returns would not be credited as negative revenue until later in the quarter. Plaintiffs argue Omega also liberalized the return policy during this period for the same purpose. Additionally, Plaintiffs contend, because these actions were so egregious and obvious they should have been uncovered during "due diligence" investigations, by not reporting these practices the Underwriters must have participated in the fraudulent conduct and "cover up" in hopes of receiving a portion of the windfall. Finally, the Underwriters bolstered this scheme by issuing misleading "booster shots" to fool investors into thinking this Company a sound investment—all the while aware that it was not.

In sum, Plaintiffs here do more than allege material omissions of certain facts, figures, or corporate strategies. Rather, Plaintiffs paint a picture of a company which prior to the initial public offering had all but realized its technological and market limit and was near obsolescence. Knowing these facts, Plaintiffs allege, Omega and the Underwriters engaged in a series of actions to omit intentionally from the Prospectus a true description, and intentionally mislead investors by burying crucial facts beneath boilerplate. Thus, in Plaintiffs' view, the offering amounted to nothing more than a windfall for both the original shareholders and the Underwriters. After extensive review of the factual allegations in the Amended Complaint, the Court finds that Rule 9(b) applies in this case. *See, e.g., Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 288 (3d Cir.1992) (finding plaintiffs did not allege ordinary negligence but alleged "averments" of fraud by referencing the defendants' intentional and reckless misrepresentation of material facts); *Kearney v. Jandernoa,* 957 F.Supp. 116, 120 (W.D.Mich.1997) (same); *Schoenhaut v. American Sensors*

*Inc.*, 986 F.Supp. 785, 795 (S.D.N.Y.1997) (determining that "the nub of the allegations" under §§ 11 and 12(a)(2) sound in fraud and Rule 9(b) applies) (citing *Schoenfeld v. Giant Stores Corp.*, 62 F.R.D. 348, 351 (S.D.N.Y.1974)); *In re Computervision Corp. Sec. Litig.*, 869 F.Supp. 56, 63 (D.Mass.1994) (collecting cases); *In re Anchor Gaming Sec. Litig.*, No. CV–S–97–1751–DAE–RJJ, 1999 WL 50079, at *4 (D.Nev. Jan.6, 1999) ("[D]espite Plaintiffs' careful attempt to avoid use of the term 'fraud,' the Consolidated Amended Class Action Complaint nonetheless clearly sounds in fraud."). For example, in Florida an "action for negligent misrepresentation sounds in fraud rather than negligence." *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1511 (11th Cir.1993) (citations omitted); *c.f. Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1468 (11th Cir.1986) (applying Alabama law and determining employees' breach of implied contract claim after termination "sounds in fraud" rather than negligence).

■ As such, the Amended Complaint is subject to dismissal without prejudice because it fails to meet the particularity requirements of Rule 9(b).[11] *See New England Data Serv., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987). This does not mean that each and every allegation set forth in the Amended Complaint may be repled. To the contrary, where it is clear that no amendment would state a claim

upon which relief may be granted dismissal with prejudice is warranted. *See* 3 *Moore's Federal Practice* ¶ 15.08[4], at 15–80 (3d ed.1998); *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir.1996). While the Amended Complaint makes voluminous assertions against the Defendants, a focused examination reveals that the Prospectus statements alleged to be materially misleading can be summarized as:

(i) "Omega Research's earnings for the quarter ending December 31, 1997 were *being* materially adversely affected [sic] by various sales trends which were causing sales to decline" (Am. Compl. ¶ 49(a)(emphasis added));

(ii) "The Company's sales were materially overstated and its product returns were materially understated" inadequately depicting the sales performance as a result of such misstatements (Am. Compl. ¶ 49(b));

(iii) "The Company was experiencing increased calls to its customer service department which was materially understaffed" (Am. Compl. ¶ 49(c));

(iv) The Company's products suffered from numerous undisclosed problems, technical glitches and "bugs" which were materially impacting sales (Am. Compl. ¶ 49(d));

(v) "The Company's products were not Year 2000 compliant," meaning they did

---

**11.** The court in *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir.1997), concerned that "defendants not be subject to frivolous suits invented to increase the amount of settlement awards rather than set forth a legitimate claim," *id.* at 68 (citation omitted), provided three well-reasoned guidelines for securities plaintiffs claiming fraud:

"First, [p]laintiffs must plead more than that defendants acted irresponsibly and unwisely, but that they were aware that 'mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.' "

"Second, defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy, ... and optimistic

predictions about the future that prove to be off the mark likewise are immunized unless plaintiffs meet their burden of demonstrating intentional deception ...."

"Third, and finally, general averments of the defendants' knowledge of material falsity will not suffice. Consistent with Fed. R.Civ.P. 9(b), the complaint must set forth 'specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading.' The rule requires that the particular times, dates, places or other details of [the] alleged fraudulent involvement" of the actors be alleged.

*Suna*, 107 F.3d at 68 (quoting *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994) (internal quotation marks omitted)).

not take into account the problem of computer calendar rollover after 1999 and that future problems could be expected because of this (Am. Compl. ¶ 49(e));

(vi) "The Company consistently failed to adhere to product research and development timeliness" undermining Prospectus statements regarding new product developments (Am. Compl. ¶ 49(f));

(vii) "The Company's stated and oft-repeated estimates for earnings of between 7 and 9 cents in the fourth quarter of fiscal 1997 were at all relevant times materially overstated (Am. Compl. ¶ 49(g));

(viii) The Offering was held primarily for the benefit of the Individual Defendants who pocketed approximately 70% of the proceeds" (Am. Compl. ¶ 49(h));

(ix) "The Offering price of $11.00 per share was an unreasonable price which was not reflective of the actual value of the shares sold." (Am. Compl. ¶ 49(a).)

As the First Circuit stated in *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir.1994), "[i]t is well established that plaintiffs in a securities action have not alleged actionable fraud if their claim rests on the assumption that the defendants must have known of the severity of their problems earlier because conditions became so bad later on." *Id.* at 361. The "materiality" of an omission is usually a fact-specific determination and should therefore be left to a jury. *See In re Stac,* 89 F.3d at 1405. However, "if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ" these issues may be appropriately resolved as a matter of law. *Fecht v. The Price Co.*, 70 F.3d 1078, 1081 (9th Cir.1995), *cert. denied,* 517 U.S. 1136, 116 S.Ct. 1422, 134 L.Ed.2d 547 (1996). In this Circuit, such a determination is tempered by the "bespeaks caution" doctrine.

### 3. Bespeaks Caution Doctrine

■ The "bespeaks caution" doctrine applies where an offering document contains meaningful cautionary statements and specific warnings of the risks involved, such that the "language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." *Saltzberg v. TM Sterling/Austin Assoc., Ltd.*, 45 F.3d 399, 400 (11th Cir.1995) (per curiam) ("[W]e accept and apply the 'bespeaks caution' doctrine as explained in *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 372 (3d Cir.1993), *cert. denied,* 510 U.S. 1178; 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994)"). In adopting the "bespeaks caution" doctrine, the *Saltzberg* court explained,

> [t]he context in which a statement is made is important. When an offering document's projections are accompanied by meaningful cautionary statement and specific warnings of the risks involved, that language may be sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law.

*Saltzberg,* 45 F.3d at 400. The *Saltzberg* court found cautionary language there sufficiently specific to be considered "not boilerplate, [and] not buried beneath too many other things, but was explicit, repetitive and linked to the projections about which plaintiffs complain." *Id.*

■ The Court finds the Prospectus contained numerous, explicit cautionary statements regarding the high degree of risk involved in the decision to invest in Omega securities. While the Plaintiffs here make conclusory arguments that the warnings are mere boilerplate, these arguments fail. As outlined in some detail above, even a cursory glance at this Prospectus put any reasonable investor on notice that this was a highly risky investment. The company had a short track record, a tenuous product line, and was dependent on many uncertain factors for success. Reasonable investors in this company knew that they were taking a chance on a high-tech stock that could have done very well or very poorly. Still, these Plaintiffs chose to invest in Omega. It is beyond any reasonable interpretation of this Prospectus to expect that no techno-

logical glitches, revenue and income fluctuations, or customer issues would develop in the period following the offering.

The Court finds the allegations of paragraphs 49(a), (c), and (e)-(i) of the Amended Complaint, regarding "sales trends," "increased calls to customer service department," "year 2000 issues," "product development timeliness," "earnings estimates," "use of the proceeds of the offering," and "price of the offering" are baseless, are not actionable under sections 11 or 12(a)(2), fall well within the bespeaks caution doctrine, and shall be dismissed with prejudice. These claims have been exhaustively analyzed by the Court. Through a careful analysis of the Amended Complaint and comparison with each of the corresponding portions of the Prospectus and applicable case law, the Court finds that no reasonable investor could have been misled based on these allegations, and thus no action under sections 11 or 12(a)(2) may lie. *See, e.g., In re Donald J. Trump Sec. Litig.,* 7 F.3d at 372 ("[w]hile a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil."). Regarding "various sales trends," "increased calls to customer service database," "year 2000 compliance" or "adherence to research and development timeliness,"—the numerous, specific and detailed disclosures in the Prospectus relegate these hollow claims to the black hole of securities litigation frivolity. Undoubtably, had this stock outperformed the market the way many computer stocks did during the period, this litigation would never have been brought. The Plaintiffs' claims as to price forecasts are similarly futile. *See Glassman v. Computervision Corp.,* 90 F.3d 617, 626 (1st Cir.1996) ("Since price is only a forecast of the firm's future performance, it is not actionable

merely because the forecast, in hindsight, does not turn out to be correct."). As can be seen from the affidavits attached to the Amended Complaint, many of those claiming injury here continued to purchase the stock as its price fell, at between $8 and $3 per share on the secondary market.

■ The *only* claims which will be dismissed without prejudice and can thereafter be filed under Rule 9(b) pleading rules,[12] are centered around the allegations in paragraphs 49(b) and 49(d) of the Amended Complaint:

> (ii) "The Company's sales were materially overstated and its product returns were materially understated" inadequately depicting the sales performance as a result of such misstatements (Am. Compl. ¶ 49(b)); (iv) The Company's products suffered from numerous undisclosed problems, technical glitches and "bugs" which were materially impacting sales (Am. Compl. ¶ 49(d)).

"Present known information that strongly implies an important future outcome is not immune from mandatory disclosure." *Shaw,* 82 F.3d at 1210. For example, if the issuer

> is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an extreme departure from the range of results which could be anticipated based on currently available information, it is consistent with the basic statutory policies favoring disclosure to require inclusion of that information in the registration statement.

*Id.* If the Plaintiffs can make out such a claim of material omission, as they have attempted to do here with insufficient particularity, based on misrepresentation of sales figures or other data, they may yet state a claim under sections 11 or 12(a)(2).

---

12. It is conceivable that a narrowed complaint could be repled in such a way that it "did not sound in fraud" and therefore Rule 9(b) would not apply, although that would require a significantly different set of factual allegations than those now before the Court. The surviving allegations of the Amended Complaint, coupled with the predicate factual allegations currently before the Court, "sound in fraud."

## B. Statements made by Underwriters in Analysts Reports

Because section 11 gives rise to liability for false or misleading statements in "any part of the registration statement, when such part became effective," reports of analysts, roadshow statements or other information published by Defendants are not generally within the purview of section 11. *See In re Stac*, 89 F.3d at 1405; *Glassman v. Computervision Corp.*, 90 F.3d 617, 623–24 (1st Cir.1996); *c.f. In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 370 (3d Cir.1993). However, the Court has determined the claims in the Amended Complaint shall be dismissed, with certain claims dismissed without prejudice. Therefore, the Court need not address the Underwriters' arguments regarding post-Prospectus statements at this time.

## C. Standing

Defendants further argue that many of the named Plaintiffs in this case did not purchase Omega stock in the initial offering, but rather in the secondary market subsequent to the offering. Plaintiffs have attached certain "form" affidavits to the Amended Complaint but these do not address whether Plaintiffs indeed purchased these shares in the initial public offering. As the Defendants point out, Plaintiffs may have no standing to assert a claim under Sections 11 and 12(a)(2) of the Securities Act unless they purchased these shares in a public offering. *See Gould v. Harris*, 929 F.Supp. 353, 358–59 (C.D.Cal. 1996) ("Because plaintiffs fail to adequately allege that they purchased their Guardian securities in the offering, rather than in the secondary market, their second and fifth causes of action must be dismissed."). Because the Court has determined certain claims will be dismissed without prejudice, this issue need not be addressed here. However, the Court notes that under the particularity requirements of Rule 9(b), Plaintiffs may have to address standing in detail should they file an additional complaint in this matter.

## D. Section 15 liability

The Court has determined Plaintiffs' section 11 and 12(a)(2) claims shall be dismissed, with certain claims dismissed without prejudice. Therefore, controlling person liability under section 15 may also be dismissed and need not be considered further at this stage. *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 544 n. 12 (8th Cir.1997) (because plaintiffs presented no actionable claim for violation of section 11, section 12(a)(2), section 10(b), or Rule 10b–5, claims for controlling person liability [under section 15] were also properly dismissed) (citing *Van Dyke v. Coburn Enter. Inc.*, 873 F.2d 1094, 1100 (8th Cir.1989); *Deviries v. Prudential–Bache Securities, Inc.*, 805 F.2d 326, 329 (8th Cir.1986)); *c.f. Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 539 n. 3 (S.D.Fla.1988), *aff'd*, 899 F.2d 21 (11th Cir.1990). This determination shall not preclude Plaintiffs from pleading controlling person liability in an amended complaint, pursuant to the limitations on claims that may be repled set out above and Rule 9(b)'s particularity requirements.

## V. Conclusion

The Plaintiffs here alleged both omissions and misrepresentations. Though the Amended Complaint does not well summarize these claims, the Court has thoroughly analyzed the Amended Complaint, the Prospectus, and the applicable case law, and determined the majority of these claims are not actionable. Finding that the remaining claims sound in fraud, and determining that certain of these claims, if pled pursuant to the particularity requirements of Rule 9(b), might state a cause of action, the Court will allow the Plaintiffs to replead these claims pursuant to the above analysis. It is therefore,

**ORDERED AND ADJUDGED** that motions to dismiss the Amended Complaint, filed by Omega Defendants, on August 18, 1998, and by Underwriter Defendants, on July 1, 1998, are **GRANTED IN PART AND DENIED IN PART.** While

numerous allegations contained in the Amended Complaint are dismissed with prejudice, pursuant to this Order, Plaintiffs may raise the following claims, or issues directly related to the following claims, against any defendant for which the law allows, under the various provisions of the Securities Act of 1933:

"The Company's sales were materially overstated and its product returns were materially understated" inadequately depicting the sales performance as a result of such misstatements (Am. Compl. ¶ 49(b));

The Company's products suffered from numerous undisclosed problems, technical glitches and "bugs" which were materially impacting sales (Am. Compl. ¶ 49(d)).

This case is closed. All motions not otherwise ruled upon are **DENIED AS MOOT.** Plaintiffs shall have 10 days from the date of this Order to file any Amended Complaint.