SHERLEIGH ASSOCIATES, LLC and Sherleigh Associates, Inc. Profit Sharing Plan, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

WINDMERE–DURABLE HOLDINGS, INC.; David M. Friedson, Harry D. Schulman; and Nationsbanc Montgomery Securities, LLC, Defendants.

No. 98–2273–CIV.

United States District Court, S.D. Florida.

June 8, 2000.

Vincent Capucci, Entwistle & Cappucci, New York City, David J. Bershad, Salvatore J. Graziano, Milberg Weiss Bershad Hynes & Lerach, New York City, Michael Elliot Criden, Hanzman Criden Chaykin & Rolnick, Coral Gables, FL, Mark C. Gardy, Abbey Gardy, New York City, Jeffrey a. Klafter, Bernstein Litowitz Berger & Grossmann, New York City, Peter Harold Rachman, Emily Cornelia Komlossy, Goodkind Labaton Rudoff & Sucharow, Fort Lauderdale, FL, Steven J. Toll, Cohen Milstein Hausfeld & Toll, Seattle, WA, Jeffrey C. Block, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, Robert Cecil Gilbert, Coral Gables, FL, Abraham Rappaport, Maya Susan Saxena, Kenneth J. Vianale, Milberg Weiss Bershad Hynes & Lerach, Boca Raton, FL, Curtis V. Trinko, New York City, for plaintiffs.

Richard G. Garrett, Clement Ryan Reetz, Michael James Rogal, Greenberg Traurig, Miami, FL, Alan Mansfield, Greenberg Traurig Hoffman Lipoff Rosen & Quentel, New York City, Parker D. Thomson, Thomson Muraro Razook & Hart, Miami, FL, Gregory A. Markel, Brobeck Phleger & Harrison, New York City, Dennis Michael Campbell, Clarke, Silverglate Campbell Williams & Montgomery, Miami, FL, Francis S. Chlapowski, Nicole M. Hunn, Brobeck Phleger & Harrison, New York City, for defendants.

### MEMORANDUM OPINION AND ORDER ON MOTIONS TO DISMISS

LENARD, District Judge.

Defendants Windmere Durable Holdings, Inc., David M. Friedson and Harry D. Schulman (the "Windmere Defendants"), and separately Defendant Nationsbanc Montgomery Securities LLC ("Montgomery"), move to dismiss the Consolidated Amended Class Action Complaint. For the reasons discussed below, the Court denies the Motion of the Windmere Defendants in its entirety, and grants Montgomery's Motion to the extent that Count IV of the Consolidated Amended Class Action Complaint is dismissed as to Montgomery and denied Montgomery's Motion in all other respects.

### I. Factual Background

This is a securities class action on behalf of all persons who purchased the publicly traded securities of Defendant Windmere–Durable Holdings, Inc. ("Windmere") between May 12, 1998 and September 22, 1998, including those who acquired Windmere common stock and 10% Senior Subordinated Notes in Windmere's July 22, 1998 public offering. This action alleges violations of the Securities Act of 1933 (the " '33 Act") and the Securities Exchange Act of 1934 (the " '34 Act").

As alleged in the Consolidated Amended Class Action Complaint (hereinafter "Amended Complaint"), Windmere is a diversified international manufacturer and distributor of small electrical kitchen appliances and other household items. On May 11, 1998, Windmere issued a press release, filed with the Securities and Exchange Commission ("SEC") in a Form 8–K and signed by Defendant Harry D. Schulman ("Schulman"), the Chief Operating and Financial Officer, announcing Windmere's acquisition of the Home Products Group ("HPG") of the Black & Decker Corporation ("Black & Decker"). According to the press release, the HPG purchase would give Windmere a license to use the valuable Black & Decker brand name in North and Latin American markets, and would increase Windmere's manufacturing and distribution capacity.

Windmere acquired HPG on June 26, 1998 for $ 315 million in cash. Windmere

financed its purchase of HPG with a "bridge loan" from NationsBank. To repay the NationsBank bridge loan, Windmere, along with the lead underwriter, Defendant Montgomery, offered its debt and equity securities to investors in a public offering on July 22, 1998 (the "July Offering"). The July Offering commenced pursuant to a registration statement, which included the Prospectus and two Prospectus supplements (collectively, the "Registration Statement"), that the SEC declared effective on June 4, 1998. In the July Offering, Windmere offered $ 103 million of common stock, approximately three million shares at $ 34 per share, and $ 130 million of 10% Senior Subordinated Notes.

The Registration Statement stated that the proceeds of the offering would be used to pay, in part, the NationsBank bridge loan. The Registration Statement further explained that Windmere "intended to utilize the marketing and distribution channels acquired through HPG to expand global market penetration of its products, particularly in Latin America." The acquisition, the Registration Statement explained, offered "immediate growth opportunities" and "uniquely positioned [Windmere] to capitalize on growth opportunities" in the household appliance and personal care markets. The Registration Statement went on to describe Windmere's 50% ownership of NewTech Electronics Industries ("NewTech"), and that Windmere would recognize 50% of the net earnings and losses of NewTech.

As alleged in the Amended Complaint, Windmere, Montgomery, Schulman and Defendant David M. Friedson ("Friedson"), Windmere's Chairman and Chief Executive Officer, promoted and sold the Windmere securities by issuing positive statements in pre-offering road show presentations to investors between July 6, 1998 and July 21, 1998. During these road show presentations, Plaintiffs allege, Defendants represented that Windmere was enjoying substantial benefits from the "complimentary strengths" between Windmere's existing operations and those of the recently acquired HPG. Windmere further represented that it "continued to enjoy strong revenue growth with a decreasing cost structure."

During this period, several adverse material facts were allegedly concealed or not disclosed by Defendants. Described more fully below, the Plaintiffs allege five categories of material omissions and misstatements. First, Windmere did not have the requisite licenses required to operate HPG and to sell HPG products in various Latin American countries and thus could not sell HPG products in these Latin American countries or even call on HPG's then-existing customer base, until such time as the licenses were obtained. Windmere allegedly knew as early as March, 1998 that, after the acquisition but prior to the July Offering, it was obligated by local law in each Latin American country to create a new company for HPG, and to register those entities with the authorities in each country. Windmere had not yet begun this complicated and time-consuming process, however. At the time of the July Offering and during the Class Period, Plaintiffs allege Windmere's failure to obtain such licenses was causing Windmere to experience declining international sales and undermining the business objectives that the HPG acquisition was intended to serve.

Second, Plaintiffs allege, prior to the sale of HPG to Windmere, Black & Decker caused HPG to aggressively stuff its distribution channels through extensive discounting and relaxation of payment terms, which allowed Black & Decker to sell HPG at an unrealistically high price. According to Plaintiffs, Latin American retailers of

HPG products were overstocked before Windmere's June 26, 1998 acquisition of HPG. Plaintiffs allege the oversupply and constrained distribution stream were known to HPG and Windmere but was not disclosed in the Registration Statement.

Third, Plaintiffs allege that the Registration Statement failed to disclose the risks and difficulties of merging Windmere and HPG's "manufacturing infrastructure" and that Windmere overstated the cost savings and efficiency gains that could be realized from the merger. HPG's manufacturing facilities in North Carolina, Mexico and Asia apparently produced for all divisions of Black & Decker, and severing HPG from Black & Decker's manufacturing operations would be significantly more confusing, costly, and time-consuming than disclosed in the Registration Statement.

Fourth, Plaintiffs allege NewTech, of which Windmere owned 50%, was then experiencing substantial problems meeting the orders of some of its largest department store customers, such as Wal–Mart, Ames Department Stores, Bradlees, and Walgreens, and as a result, was suffering a substantial decline in sales. Plaintiffs allege this information was in Defendants' possession but was not disclosed in the Registration Statement.

Fifth, Plaintiffs allege Defendants Friedson and Schulman protected themselves from the possible negative consequences of the merger, and thus the undisclosed material risks enumerated above, through surreptitiously hedging their own Windmere stock holdings against a share price decline. Prior to the stock price drop, but during the period just before the Registration Statement was declared effective, Plaintiffs allege Friedson and Schulman employed a sophisticated trading strategy of using puts and calls on their own Windmere common stock that guaranteed that the value of their shares would be fixed in a range between $ 21 per share and $ 33 per share. These two Defendants allegedly traded these positions through a common broker at CIBC Oppenheimer in Boston.

On September 23, 1998, eight weeks after the July Offering, Windmere issued a press release stating that it was experiencing weak international sales, particularly in Latin America, and that NewTech was experiencing lower than expected earnings. That day, Windmere's stock price dropped to $ 7.1875 per share, down $ 27 per share from the $ 34 July Offering price. Between September 23, 1998 and February 23, 1999, the price further declined from $ 7 per share to below $ 4 per share. Although Windmere had previously expected 1998 earnings per share to be $ 1.50, Windmere in actuality realized earnings of only $ 0.57 per share for 1998.

## A. Specific Allegations of False and Misleading Statements

### 1. Statements Prior to the July Offering

Plaintiffs allege Windmere issued a series of false and misleading statements in connection with the July Offering. On May 11, 1998, Windmere issued a press release announcing the acquisition of HPG (the "May 11 Press Release").[1] This re-

---

1. This press release and others referred to in the Amended Complaint are referenced or reproduced in part within the pleading, but not attached thereto. The entire press release documents are provided by the Windmere Defendants, however. (*See* Windmere Defs. Mot. Dismiss at n.23.) The following excerpts of the May 11 Press Release appear at pages 13–14 of the Amended Complaint:

> Windmere–Durable Holdings, Inc., a diversified manufacturer and distributor of a broad range of consumer products, including personal care products for the home and professional salons, kitchen electric ap-

lease stated, in part, "Windmere and Black & Decker have established a long-term licensing arrangement which will allow Windmere to continue to market products under the Black & Decker brand name in ... North and Latin America ... for a minimum of six and one-half years on a royalty-free basis[.] ... The combined company will be uniquely positioned to capitalize on growth opportunities[.] Immediate growth opportunities will result from ... [these] marketing capabilities[.]" (Am.Compl.¶ 30.)

Plaintiffs further allege that on May 12, 1998, Defendants Schulman and Friedson convened a nationwide conference call for large Windmere shareholders and potential shareholders, including hedge funds, stock traders, brokers and securities analysts ("the May 12 Conference Call"). During the May 12 Conference Call, Defendants allegedly stated; (1) the acquisition would "more than triple" Windmere's 1998 revenues; (2) the acquisition would be "accretive," allow Windmere to obtain substantial cost synergies, and allow Windmere to market its products using HPG's well-recognized brand name; and (3) that Windmere was on target to post revenue of $ 750 million and earnings per share of $ 1.50 for 1998.

Plaintiffs allege these statements were materially false and misleading. At the time of the May 11 Press Release and the May 12 Conference Call, Windmere allegedly did not have the licenses needed to conduct business in the Latin American countries in which it proposed to sell and market HPG products. The Latin American market was a linchpin, Plaintiffs allege, of Windmere's expected "immediate growth opportunities" that would result from the acquisition.

On May 15, 1998 Windmere filed a Form 10–Q for the first quarter of 1998, the period ending March 31, 1998, reporting sales of $ 55.3 million and net earnings of $ 1.136 million for the quarter. This Form 10–Q also reported Windmere's decision to purchase HPG and thereby obtain the purported ability to market products in North and Latin America. On June 10, 1998, Windmere issued a press release to announce management changes "that will successfully integrate the recent acquisition of [HPG]." (the "June 10 Press Release") (Am.Compl.¶ 36.) The June 10 Press Release reported "Windmere–Durable's revenues for 1997 were $ 261.9 million, and with the pending acquisition of Black & Decker Corporation's Household Products Group, Windmere's annualized revenue rate will be approximately $ 750 million." (*Id.*)

pliances and consumer electronics, today announced that it has signed a definitive agreement to acquire The Black & Decker Corporation's Household Products Group, which will include the Cooking, Garment Care, Food Preparation and Beverage categories.

Pursuant to the terms of the acquisition agreement, Windmere will purchase the assets of The Black & Decker Corporation's Household Products Group for $315 million in cash. In connection with the transaction, Windmere and Black & Decker have established a long0term licensing arrangement which will allow Windmere to continue to market products under the Black &

Decker brand name in the Cooking, Garment Care, Food Preparation and Beverage categories in North and Latin America, excluding Brazil, for a minimum of six and one-half years on a royalty-free basis, with potential renewal periods upon mutual agreement.

\* \* \* \* \* \*

The combined company will be uniquely positioned to capitalize on growth opportunities within the personal care and kitchen appliance categories. Immediate growth opportunities will result from the combination of innovative product development, marketing capabilities and manufacturing infrastructure.

On June 23, 1998, Plaintiffs allege Windmere issued a press release (the "June 23 Press Release") relating to its acquisition, stating in pertinent part:

"We look for the integration of The Black & Decker Household Products Group to begin as soon as the transaction is completed," added Mr. Friedson. "We expect to benefit from the significant business growth and operating synergies created by this acquisition beginning in the first six months of the acquisition and continuing through the next several years."

(Am.Compl.¶ 37.) After the May 12 Conference Call, analyst reaction was allegedly favorable, with one industry analyst, CIBC Oppenheimer, issuing a favorable rating based in part on "sales synergies" such as expanding into new categories and selling products in Latin America.

## 2. The Road Show

During the pre-offering road show, from July 6, 1998 to July 21, 1998, Plaintiffs allege Defendants Montgomery, Schulman and Friedson "participated in oral presentations, including demonstrative presentations with graphs and diagrams, stressing the success that Windmere was having and would continue to have after the acquisition[.]" (Am.Compl.¶¶ 41–43.) Plaintiffs state that "Defendants were under intense pressure to complete the offering as soon as possible, as the proceeds were needed to repay NationsBank for the bridge loan used to pay for the HPG acquisition."

## 3. The Registration Statement

Plaintiffs assert the Registration Statement, effective June 4, 1998, materially misstated the nature of the acquisition, in that it did not adequately describe the requirements of Windmere's integration with HPG, and the specific financial, legal and logistical risks that were ongoing or were foreseeable at the time. The Registration Statement stated, "[t]he Company has combined top brand names and a reputation for quality and innovation with its efficient, low-cost, vertically integrated manufacturing capabilities. The Company expects to continue to achieve growth and increased profitability by pursing the following strategies[.]" (Am.Compl.¶ 44.) Plaintiffs then highlight two strategic categories, "Leverage Manufacturing Capabilities," and "Expansion of the Company's International Presence." (See id.) Within the former, the Registration Statement states:

The Company intends to utilize the marketing and distribution channels acquired through the HPG Acquisition to expand the global market penetration of all of its products, particularly in Latin America. As a result of the HPG Acquisition, the Company has acquired the leading market share in irons, and a smaller market presence in the blender category, in Argentina, Colombia, Ecuador, Puerto Rico, Venezuela, Chile, Mexico and the Caribbean. In addition to targeting mass merchandisers, wholesalers, warehouse clubs and government institutions in Latin America, the Company intends to pursue alternative channels of distribution in Latin America which it believes will continue to be important sources of sales. On a pro forma basis, after giving effect to the HPG Acquisition, the Company's international sales would have been $ 218.9 million in 1997, as compared to $ 82.1 million in international sales for Windmere–Durable alone in 1997.

(Id. ¶ 45.) Plaintiffs contend these facts were materially false and misleading, and that the true facts were:

a) On or prior to the effective date of the Prospectus, July 22, 1998, Windmere could not use Black & Decker's existing

licenses to operate its business in Latin America. HPG Latin America was not previously run as a separate entity by Black & Decker, but functioned as part of Black & Decker's Power Tools Division. When Windmere acquired HPG, it was required to undergo the complicated and time-consuming process of creating a new company for HPG in each Latin American country in which HPG operated and was required to register those entities to do business. Thus, Windmere could not even call on HPG's existing customers in Latin America for continued business because it lacked the proper licenses to sell HPG's produces in those foreign countries. Windmere had internally projected that these corporate entities would be organized between March and June 1998. Nevertheless, the corporate requirements had not been met prior to the Class Period or the July Offering. Thus, at the time the Company issued the above statements, it was unable to "utilize the marketing and distribution channels" of HPG to expand market penetration in Latin America until it had obtained the requisite licenses. In July 1998, a former HPG employee visited the Company's manufacturing plant in Queretaro, Mexico, and learned that Windmere could still not call on HPG's existing customers and was losing business as a result. Indeed, Windmere had not obtained the necessary licenses throughout the Class Period. In late July and August, Windmere's General Counsel sought to move the licensing process forward, but without success. As a result, throughout the Class Period, Windmere failed to meet the necessary corporate requirements and obtain the needed licenses to do business in Latin America. The Company would not be able to realize significant profits in Latin America until the legal requirements of doing business there had been met. The Company's lack of the necessary licenses prior to Windmere's takeover of the HPG business in Latin America constituted a principal cause for the Company's later revealed poor performance during the Class Period.

b) Moreover, in a summer 1998 senior-staff meeting, significant problems with the integration of HPG's Latin American Division were discussed. Soon after it acquired HPG on June 26, 1998, Windmere discovered that Latin American retailers' warehouses were overstocked with HPG products. As a result, Windmere could not sell product in Latin America competitively because retailers were saturated resulting from prior sales of HPG products to them at discounted prices or on other favorable terms. Windmere was fully aware of the excessive inventory build-up problem in Latin America at least as early as when the Company acquired HPG. By the time Windmere acquired HPG on June 26, 1998 and for almost a full month thereafter before the July 22, 1998 effective date of the Registration Statement, the inventories of Latin American retailers were bloated with HPG products and additional sales of HPG products to them at least throughout the remainder of 1998 would [be] very difficult to achieve until those inventories had been substantially sold off. Defendants ... had begun operating HPG by June 26, 1998, when HPG was acquired. Indeed, Defendants themselves told the marketplace and investors during road show presentations that Windmere was already in the process of integrating the operations of HPG. There was thus a large build-up of HPG products on the shelves of HPG's Latin American retailers before the July Offering[.] Despite the severity of the

sales problem for Windmere, the Company failed to disclose it to the investing public in the Registration Statement and instead emphasized the dramatic increase in sales which would purportedly result from the HPG acquisition. (*Id.* ¶¶ 46(a)-(b).)[2]

Plaintiffs further allege Defendants made material misstatements in the section entitled, "Risks of International Operations and Expansion," describing certain international economic and political variables that could effect the company's business, including "the burdens and costs of compliance with a variety of foreign laws and, in certain parts of the world, political instability[.]" (Am.Compl.¶ 53.) Plaintiffs claim this description was materially false and misleading because, at the time the statement was made, Windmere "was already materially reducing sales in Latin America because the Company could not do business with HPG's existing customers. In considering the HPG acquisition, the Company had internally projected that it would obtain the required licenses between March and June 1998, a period well before the issuance of the above statements." (*Id.*) Thus, Plaintiffs allege, the discussion of risk in the Registration Statement was "but a generic warning containing no meaningful factual disclosure of the adverse facts which were then actually negatively impacting Windmere's business by at least July 22, 1998." (*Id.*)

In addition, Plaintiffs contend, the "High Volume, Low–Cost Manufacturing Capabilities" section contained material misstatements. There, the Registration Statement states, "[t]he Company believes that its high volume, vertically integrated manufacturing capabilities provide the Company flexibility and cost advantages[.] The Company intends to take advantage of its capabilities as a multinational manufacturer to reduce operating costs and increase productivity." (Am.Compl.¶¶ 55–56.) Plaintiffs allege these statements were false because certain manufacturing integration within the combined company "would take a significant amount of time, and Windmere would have to find its own companies to create HPG products. Windmere nevertheless told the public in its June 23, 1998 release ... that it expected to enjoy the benefits and synergies from the HPG acquisition 'beginning in the fist six months of the acquisition.'" (*Id.* ¶ 57.)

#### 4. NewTech

Plaintiffs allege Defendants made material misstatements or omissions with respect to NewTech, by stating in the Registration Statement: (1) "[b]y having a portfolio of brand names, NewTech is able to offer retailers proprietary and flexible merchandising programs," and (2) "[a] decrease in business from any of its major customers could have a material adverse effect on the Company's business, financial condition and results of operations." (*Id.* ¶¶ 59–60.) Plaintiffs contend these statements were false and misleading, because "[d]uring the Class Period, NewTech was unable to deliver product to several of its top customers and suffered declining sales as a result." (*Id.* ¶ 60.) Plaintiffs provide several specific examples of situations where NewTech allegedly could not fulfill product or sales de-

---

2. Pursuant to the requirement to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," Item 7 of Form 10–K and Item 2 of Form 10–Q, 17 C.F.R. § 229.303, Defendants allegedly omitted the need to obtain licenses in Latin America in completing these forms, as well. (*See* Am. Compl. ¶ 50.)

mands during the period. (*See id.* ¶¶ 61–62.)

Thus, because of these factors, Plaintiffs allege there "was not [a] reasonable basis in fact for the representations made by Defendants in connection with the July Offering that Windmere would have EPS of $ 1.50 in 1998." (*Id.* ¶¶ 63.)

### 5. Alleged Post–Offering Conduct

Plaintiffs allege rumors of Defendants' misconduct leaked to investors shortly after the Offering, putting downward pressure on the stock price. Plaintiffs claim that in response, on August 11, 1998, Windmere issued a press release reporting "Record Revenues for 1998 Second Quarter and First Half" (the "August 11 Press Release"). The August 11 Press Release stated, in part:

> We are ahead of our scheduled plans, the assimilation of the acquisition is going very smoothly, and we are confident in our ability to integrate our new business. By doing so, we have reallocated our resources to higher-margin, higher-volume products. We are very optimistic about the rest of 1998 as well as the Company's long-term growth outlook.
>
> Since the end of the quarter, Windmere–Durable has completed several transactions that have greatly strengthened our financial position, concluded Mr. Friedson.

(Am.Compl.¶ 65.) Then, on or about August 12, 1998, Defendants Friedson and Schulman allegedly organized a nationwide news conference, and stated; (1) that gross margins were strengthening; (2) that the integration of the HPG was progressing well, placing Windmere on track to post 1998 earnings per share of $ 1.50; (3) that Windmere had taken a one-time $ 11.4 million charge in connection with the acquisition; and (4) that Windmere was beginning to leverage the Black & Decker brand name. (*See* Am. Compl. ¶ 67.)

Plaintiffs next allege that on August 14, 1998 Windmere filed its second-quarter Form 10–Q with the SEC for the period ending June 30, 1998, and that the Form 10–Q was silent on; (1) Windmere's continued lack of the required licenses to sell HPG products in any of the Latin American countries to which the HPG acquisition was designed to afford Windmere access; (2) the bloated inventory condition of HPG's Latin American retailers; and (3) then decreasing sales at NewTech due to that join-venture's inability to satisfy department and retail store customers with sufficient product. (*See* Am. Compl. ¶ 68.)

### 6. September 23 Press Release

On September 23, 1998, Windmere announced that its financial results for the quarter ending September 30, 1998 and full year ending December 31, 1998, would fall far short of analysts' expectations and its own previous predictions (the "September 23 Press Release"):

> Household Products, Inc., formerly Black & Decker Household Products Group that was acquired on June 26, 1998, is experiencing weak international sales, primarily in Latin America and Canada, and softness in the domestic market for higher-end product lines. As a result, Household Products' third-quarter sales of Black & Decker-branded products will be as much as $ 30 million to $ 40 million off from their original planned budget. Higher-than-planned expenses to integrate and del-ink Household Products, Inc., from Black & Decker on the reduced sales volume will further contribute to lower profit margins.

\* \* \* \* \* \*

Additionally, NewTech Electronics Industries, Windmere–Durable's 50 percent owned joint-venture is experiencing lower-than-expected earnings.

(Am.Compl.¶ 69.) In addition, the September 23 Press Release stated that Michael P. Hoopis, president of HPG, had resigned to become chief executive officer of another corporation. (*See id.*)

In response to this announcement, the price of Windmere stock plummeted $ 8.50 on September 23, falling to $ 7.1875 per share—a decline of nearly 80% from the July Offering price of $ 34 per share.

Plaintiffs allege the September 23 Press Release failed to reveal the true nature of Windmere's problems and the reason behind the drop in sales by failing to admit the drop in sales resulted from failure to obtain Latin American licenses. Finally, Plaintiffs allege Defendants still have not disclosed the true facts behind the drop in sales and the material risks investors faced when purchasing shares of the Company's stock. In five counts, Plaintiffs allege that by their actions, the Defendants have violated the 33 Act and the 34 Act.

In two separate motions, Defendants contend Plaintiffs have failed to state any claim upon which relief may be granted, and seek dismissal of the Amended Complaint under various theories. The Court will address each in turn.

## II. Standard of Review

■ In considering a motion to dismiss, the complaint is taken in the light most favorable to the plaintiff, and all well-pled facts alleged by the plaintiff are accepted as true. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Conley v. Gibson,*

355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Bank v. Pitt,* 928 F.2d 1108, 1111–12 (11th Cir.1991).

■ On a motion to dismiss a claim of violation of the federal securities laws, the court may "take judicial notice ... of relevant public documents required to be filed with the [SEC], and actually filed." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999). Furthermore, the court may take judicial notice "of facts that are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned[,]"and doing so will not convert the motion to dismiss into one for summary judgment. *Id.* (citing Fed.R.Evid. 201(b)).

■ An action may be dismissed as futile when the complaint, even when amended "would fail to state a claim upon which relief could be granted." 3 *Moore's Federal Practice* ¶ 15.08[4], at 15–80 (3d ed.1998); *see also Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996) ("In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion.") (citations omitted).

## III. Discussion and Analysis

First analyzing the appropriate pleading standards for securities fraud claims under the '33 Act and the '34 Act, the Court analyzes the allegations in the Amended Complaint under the appropriate standard of review. Finding Plaintiffs have stated actionable securities fraud claims on all counts, except for Count IV as to Defendant Montgomery only, the Court determines that the Motion of the Windmere Defendants shall be denied in its entirety, and the Motion of Defendant Montgomery shall be granted as to Count IV only and denied in all other respects.

## A. Sections 11 and 12(a)(2) of the Securities Act of 1933

■ The allegations in Counts I and II claim all Defendants violated sections 11 and 12(a)(2) of the '33 Act by making material omissions or misstatements in connection with the July Offering. Section 11 allows any purchaser of a security to bring a cause of action based on material misstatements, if any part of the registration statement,

when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . .

15 U.S.C. § 77k(a). A plaintiff may bring a section 11 claim against any person who signed the prospectus, the officers and board of directors of the issuing corporation, the underwriters of the securities offering, or any expert whose profession gives authority to that part of the registration statement he or she prepared. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *United States v. Naftalin,* 441 U.S. 768, 777–778, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979) ("The 1933 Act was primarily concerned with the regulation of new offerings.").

■ In order to state a section 11 claim, the plaintiff "must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re Stac Elecs. Secs. Litig.,* 89 F.3d 1399, 1403–04 (9th Cir.1996) (citation omitted), *cert. denied sub nom., Anderson v. Clow,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). As the Supreme Court explained:

Section 11 was designed to assure compliance with the disclosure provisions of the ['33] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of the security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence.

*Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683; *see also Stac Elecs.,* 89 F.3d at 1404 ("No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions.") (citation and quotation marks omitted); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ Under section 12(a)(2), on the other hand, any person who "offers or sells a security . . . by means of a prospectus or oral communication" that "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77l(a)(2). Thus, section 12(a)(2) liability may be based on oral as well as written communications. *See id.*

■ Where a section 11 claim "sounds in fraud," the particularity requirements of Federal Rule of Civil Procedure 9(b) may apply. *See Rhodes v. Omega Research,* 38 F.Supp.2d 1353, 1359 (S.D.Fla.1999) (collecting cases). In such a case, Plaintiffs must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3)

the content and manner in which these statements misled the plaintiffs; and (4) what the defendants gained by the alleged fraud. *See, e.g., Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1381 (11th Cir.1997) (per curiam) (adopting in part holding of court below, Case No. 95–0405–CIV, 1995 WL 931702, at *19 (S.D.Fla. Sept.22, 1995) (appendix)). Yet, where particularity requirements are applied to such claims, "[a] balance must be struck between allowing bald allegations of material misstatements or omissions with little factual basis, on the one hand, and so tightening the requirements of pleading that Plaintiffs must plead evidence, on the other." *Rhodes,* 38 F.Supp.2d at 1361.

### 1. Plaintiffs Have Adequately Pled Section 11 and 12(a)(2) Claims for Material Omissions in the Registration Statement Against All Defendants.

■ The most significant of Plaintiffs' allegations are the assertions that at the time of the July Offering, "Windmere did not have the requisite licenses in place required to operate HPG and to sell HPG produces in Latin America and thus could not, until such time as the licenses were obtained, sell HPG products in Latin America or even call on HPG's then-existing customer base." (Pls. Mem. Opp. Underwriter's Mot. Dismiss at 11.) Plaintiffs contend that the disclosures regarding the HPG acquisition triggered a duty to disclose, among other things, the risk that, after the acquisition, months could pass during which Windmere would be unable to move or sell products in Latin America until these license issues were resolved.

■ The Eleventh Circuit has stated that "[a] duty to disclose may ... be created by a defendant's previous decision to speak voluntarily. Where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, a duty to disclose arises." *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986). Similarly, the First Circuit has explained that "the obligations that attend the preparation of a registration statement and prospectus filed in connection with a public stock offering ... embody nothing if not an affirmative duty to disclose a broad range of material information." *Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1202 (1st Cir.1996). Consequently, in connection with a public stock offering, "there is a strong affirmative duty of disclosure." *Id.*

Here, the Registration Statement made a number of affirmative statements regarding Windmere's acquisition of HPG and the HPG's operations at that time. For example, the Registration Statement discussed HPG's "marketing and distribution channels" and "leading market share" in Latin America as well as the expectation of Windmere's international sales on a pro forma basis, including HPG's 1997 results. (Am.Compl.¶ 45.) Additional facts relevant to this risk, but not disclosed by Defendants are: (1) alleged "stuffed channels" within the HPG's chain of distribution, such that prior to the acquisition Windmere should have disclosed these particular market conditions; (2) that certain specific difficulties with integrating HPG manufacturing facilities in Mexico with the remainder of Windmere's operations, amounted to a material risk that Windmere would not be able to sell products in Latin America until these obstacles were cleared; and (3) the "pro-forma" comparison of a combined Windmere–HPG organization was misleading given that at the time of the Registration Statement Windmere was not in a position to operate

HPG in its Latin American markets.[3]

The Windmere Defendants spoke voluntarily in the Registration Statement and the press releases about Windmere's intention to use the distribution channels acquired by purchasing HPG to expand the sales of its products, "particularly in Latin America." (Am.Compl.¶ 45.) Further, the Company proclaimed that it intended "to pursue alternative channels of distribution in Latin America which it believes will continue to be important sources of sales." (*Id.*)

### 2. The Registration Statement Does Not Disclose The Risk of Latin American Licensing or Distribution Problems.

■ In the section entitled "Risk Factors" at pages S–14 to S–24, the Registration Statement provides detailed information on certain risk factors accompanying any investment in Windmere securities and associated with the acquisition of HPG. Upon review of the numerous risk subsections, the Court finds four categories relate to national licencing agreements and distribution within Latin American markets: "Risks of International Operations and Expansion," "Dependence on International Trademarks," "Risks Associated with Integration of Black & Decker Household Products Group," and "Government Regulation."

After carefully reviewing the entire Registration Statement and these risk sections in particular, and comparing these with the factual allegations which the Court must take as true, the Court finds none of these risk sections or additional cautionary language in the Registration Statement adequately address the issue of renewed licenses in Latin American markets—the allegedly undisclosed material risk here—under the "meaningful cautionary language" standard discussed below. As related to certain, specifically alleged integration difficulties, the Registration Statement's risk discussion does not adequately cover the real or foreseeable risk that ongoing international sales of Windmere's products would or could be foreseeably jeopardized by the need to obtain such licenses. Further, as discussed below, the "cautionary language" attached to various press release statements also fails to meet the "meaningful cautionary language" standard that would allow a reasonable investor to understand these alleged material risks. The section entitled, "Risk of International Operations," for example, addresses issues relating to international sales and marketing in foreign jurisdictions, including Latin America. The section does state that, "[b]ecause the Company manufacturers its products and

---

3. Mirroring the section 11 and 12(a)(2) disclosure requirements, Item 303(a) of Regulation S–K, 17 C.F.R. § 229.303 required Defendants to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material ... unfavorable impact on net sales or revenues or income from continuing operations." In addition, Item 11(a) of Form S–3 required Defendants to disclose in the Registration Statement "any and all material changes in the registrant's affairs ...." *Id.* The Instructions to Paragraph 303(a) further state: "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results." *Id.* In addition, the SEC has explained that when completing "Management's Discussion and Analysis of Financial Condition and Results of Operations," registrants should follow a two-step analysis in determining when a known trend or uncertainty is required to be included in the disclosure: "A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the Registrant's results of operations." *Id.*

conducts business in several foreign countries, the Company is affected by economic and political conditions in those countries, including ... the burdens and costs of compliance with a variety of foreign laws and, in certain parts of the world, political instability." (Prospectus at S–15.) No mention is made, however, of the risk of licensing Windmere's operations subsequent to the HPG acquisition, or the specific requirement to seek licenses in various Latin American markets. Rather, the section focuses on currency, economic, and political considerations, particularly as they relate to the People's Republic of China.

The "Dependence on Trademarks" section, on the other hand, touts the fact that "[a]s part of the JPG Acquisition, the Company licensed the *Black & Decker* brand for use in marketing HPG products in North America, Central America, South America (excluding Brazil) and the Caribbean under a licensing arrangement with a minimum term of six and one-half years." (*Id.* at S–17.) This section describes the licensing arrangement between Windmere and Black & Decker, and goes on to describe risks relating to trademark exploitation, but does not substantively address Windmere's need to get approval of domestic governments or licenses to sell Black & Decker products after the acquisition was consummated.

Similarly, the "Patents and Protection of Proprietary Technology" section addresses "patent and design registration," and discusses the risks of creating new proprietary technology and patent registration once new technology is created. (*See id.* at S–17.) Again absent, however, is any mention of the need to get approval of domestic governments or licenses to sell Black & Decker products after the sale was consummated.

After reviewing the entire Registration Statement, the Court finds notably absent any section that addresses what would allegedly cause the significant gap in sales volume: risks relating to international intellectual property generally, risks relating to international licensing requirements specifically, or related risks due to uncertainty of various national licensing requirements.

### 3. Section 11 and 12(a)(2) Claims Here Do Not Sound In Fraud.

▮ The Court has carefully reviewed the allegations related to the section 11 and 12(a)(2) claims in Counts I and II and finds the allegations do not "sound in fraud." *See Rhodes,* 38 F.Supp.2d at 1361 (discussing Rule 9(b) application and collecting cases). The section 11 and 12(a)(2) claims are silent on whether the Defendants intentionally withheld from the public information that Latin America licenses would have to be obtained. (*See* Am. Compl. ¶¶ 74–93.) Furthermore, the Amended Complaint separates the '33 Act claims from the allegations of fraudulent conduct and scienter with respect to the '34 Act claims, which are pled only in Count IV. (*See* Am. Compl. ¶¶ 75, 85, 91–121.)

The Court finds the section 11 and 12(a)(2) claims plainly allege Defendants' liability without resort to allegations of fraud. Rather, the claims are framed as a failure of the Defendants to adequately conduct "due diligence" investigations, to discover the need to obtain such licenses, and to disclose this risk to the public in connection with the offering. As this Court has previously stated, "allegations cannot be thought to constitute 'averments of fraud,' absent any claim of scienter and reliance. Otherwise any allegation of nondisclosure of material information would be transformed into a claim of fraud for purposes of Rule 9(b)." *Rhodes,* 38 F.Supp.2d at 1360–61 (quoting *Shaw,* 82

F.3d at 1223). And, as explained in *Shaw,* where the issuer

> is in possession of nonpublic information indicating that the quarter in progress at the time of the public offering will be an extreme departure from the range of results which could be anticipated based on currently available information, it is consistent with the basic statutory policies favoring disclosure to require including of that information in the registration statement.

82 F.3d at 1210. After careful review of the Amended Complaint, the Court finds the section 11 and 12(a)(2) claims do not sound in fraud.

### 4. Safe Harbor and Bespeaks Caution Doctrine Are Not Applicable.

 Defendants argue the challenged statements are forward looking in nature, are subject to the statutory safe harbor, and thus not actionable.[4] The Private Securities Litigation Reform Act of 1995, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4 *et seq.* (1997) (hereinafter "Reform Act"), "provides a safe harbor from liability for certain 'forward-looking' statements." *Harris v. Ivax,* 182 F.3d 799, 803 (11th Cir.1999) (quoting 15 U.S.C. § 78u–5(c)(1)). Pursuant to the safe harbor, "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" *Id.* (quoting 15 U.S.C. § 78u–5(c)(1)). Thus, the Court must discern whether any such statement is accompanied by "meaningful cautionary language." *Id.* Yet the harbor has limits, for "a defendant can fully benefit from the safe harbor's shelter only when it has disclosed risk factors in a warning accompanying the forward-looking statement." *Id.* at 807. The cautionary language must therefore meet a threshold of specificity. *See id.* (holding that "when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment").

Moreover, where plaintiffs allege a "material omission," the cautionary language must be sufficiently "meaningful," such that it discloses "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). The *Harris* court found general disclosures relating to a goodwill writedown, and consequential one-time charge to earnings, adequate for a reasonable investor to assess the risk associated with certain forward-looking statements, and thus an accompanying warning was "of a significance similar to that [risk] actually realized." *Id.* The court concluded, "[i]n short, where an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Id.*

Here, the Court has analyzed the Registration Statement and additional documents for both general "boilerplate" cautionary language, and for specific cau-

---

4. As Plaintiffs point out, the statutory safe harbor for forward-looking statements does "not apply to a forward-looking statement ... made in connection with an initial public offering." *See* 15 U.S.C. § 77z–2(b)(2)(D). To the extent the alleged misstatements may be within the safe-harbor, such statements relating to the 10% Senior Subordinated Notes offering may not be afforded the safe harbor defense to the Securities Act and Exchange Act Claims. *See id.; see also* 15 U.S.C. § 78u–5(b)(2)(D).

tionary language of risks relating to international licensing issues. Plaintiffs allege Defendants failed to reveal either known, present facts, or facts that should have been known through due diligence, regarding Windmere's lack of licenses to operate HPG. Plaintiffs further allege certain risk factors and cautionary statements were, themselves, materially misleading or devoid of material risk disclosures, and that therefore the statements cannot be within the safe harbor because the disclosures were inadequate. Plaintiffs argue that "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

After comparing the Amended Complaint's factual allegations and the various cautionary statements within the ambit of the Reform Act's safe harbor provision, the Court finds the cautionary language, both in the aggregate and when analyzed for specifics, when cast against the alleged omissions and misstatements here, did not fairly and adequately warn potential investors of the alleged risks associated with investing in Windmere securities. Thus, the Court finds the Reform Act's safe harbor provision does not apply to the allegations in the Amended Complaint.[5]

### 5. Material Omissions or Misstatements Amount to Actionable Claim

■ Taken together, the allegations of material misstatements and omissions in the Amended Complaint adequately state claims against all Defendants for violations of sections 11 and 12(a)(2) of the '33 Act. Plaintiffs have alleged through specific factual allegations: (1) that the registration statement contained omissions or misrepresentations; and (2) that the omissions or misrepresentations were material, that is, would have misled a reasonable investor about the nature of his or her investment. As such, the Court denies the motions to dismiss Counts I and II as to all Defendants.

### B. Section 10(b) and Rule 10b–5 Claims

Plaintiffs allege in Count IV that all Defendants failed to disclose material facts and made false statements regarding the Company's financial status in violation of section 10(b) of the '34 Act, 15 U.S.C. § 78j(b) (hereinafter "Section 10(b)"), and 17 C.F.R. § 240.10b–5 (hereinafter "Rule 10b–5").

### 1. Section 10(b) and Rule 10b–5

■ Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C.

---

5. Defendants further argue the "bespeaks caution doctrine" applies to the challenged statements, and that certain cautionary language associated with the disclosures was "sufficient to render the alleged omissions or misrepresentations immaterial as a matter of law." *Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 45 F.3d 399, 400 (11th Cir.1995). Here, the Defendants allegedly made present, known misrepresentations or omissions, as the Defendants knew or should have known the licensing requirement was not met but nonetheless failed to disclose the requirement, or failed to disclose the lack of licenses could result in drastically decreased revenue. *See, e.g., Stac Elecs.*, 89 F.3d at 1408 ("By definition, the bespeaks caution doctrine applies only to affirmative, forward-looking statements"). The Court will reserve final ruling on this issue pending fact discovery.

§ 78j(b). In addition, Rule 10b–5 makes unlawful any untrue statement of material fact or the omission of a material fact that would render statements made misleading in connection with the purchase or sale of any security. *See* 17 C.F.R. § 240.10b–5. To successfully state a securities fraud claim under Rule 10b–5, a plaintiff must demonstrate: (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; (5) that proximately caused the plaintiff's injury. *See Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1447 (11th Cir.1997); *see also Bryant,* 187 F.3d at 1276, 1281 (citing *Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir.1989) (*en banc* )).

#### a. Rule 9(b) Particularity

■ To establish fraud under Rule 10b–5, a plaintiff must also meet the requirements of Federal Rule of Civil Procedure 9(b). As discussed above, Rule 9(b), "will be satisfied if the complaint sets forth what statements or omissions were made in what documents or oral representation; the time and place of the statements or omissions; who made the statements; the content of the statement and the manner in which they misled the plaintiffs; and what the defendant 'obtained as a consequence of the fraud.'" *In re Sunbeam Secs. Litig.,* 89 F.Supp.2d 1326, 1336

(S.D.Fla.1999) (quoting *Brooks,* 116 F.3d at 1369).

#### b. Heightened Pleading Requirements under the Reform Act

Furthermore, the Reform Act established a heightened pleading requirement for private securities plaintiffs alleging violations of § 10(b) and Rule 10b–5. Under § 78u–4(b), a plaintiff must first specify each statement alleged to have been misleading and the specific reason or reasons why such statement is misleading. *See* 15 U.S.C. § 78u–4(b)(1).[6] Thus, a plaintiff must plead with particularity all facts upon which the fraud allegation is based, a standard somewhat more specific than the Rule 9(b) standard. Second, a plaintiff shall "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[7]

In *Ernst* the Supreme Court defined scienter in the Rule 10(b) context as a mental state embracing intent to deceive, manipulate, or defraud. *See* 425 U.S. at 193 n. 12, 96 S.Ct. 1375. The *Ernst* Court did not address whether scienter includes not only intent, but also recklessness. *See McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989) (quoting *Ernst,* 425 U.S. at 193, n. 12, 96 S.Ct. 1375) ("We need not address here the question whether, in some circumstances, reckless

---

**6.** Section 78u–4(b)(1) provides:

In any private action arising under this title in which the plaintiff alleges that the defendant-

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information

and belief, the complaint shall state with particularity all facts on which that belief is formed.

**7.** Section 78u–4(b)(2), "Required State of Mind," provides:

In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

behavior is sufficient for civil liability under § 10(b) and Rule 10b–5."). The *McDonald* court held that scienter was satisfied by a showing of "severe recklessness." 863 F.2d at 814. *McDonald* further defined severe recklessness as "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id.* (citations omitted). These holdings were pre-Reform Act, however, and the applicable standard remained undefined until recently.

Finally "waging into the thicket" of contrasting circuit definitions for post-Reform Act scienter, the Eleventh Circuit recently clarified the applicability of "severe recklessness," holding that a "complaint alleging with particularity that a defendant acted with a severely reckless state of mind still suffices to state a claim for civil liability under § 10(b) and Rule 10b–5." *Bryant,* 187 F.3d at 1283. The *Bryant* court further explained that while averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness . . . such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285–86. Thus, although the "motive and opportunity" test adopted by other circuits may be relevant to the scienter analysis, it is not dispositive of the issue of severe recklessness in this Circuit. *See Sunbeam,* 89 F.Supp.2d at 1336.

## 2. Claims Against Windmere Defendants for Section 10(b) and Rule 10(b)–5 Violations Are Adequately Pled.

Applying the severe recklessness standard adopted in *Bryant,* the Court can evaluate whether the specific facts alleged in the Amended Complaint create a strong inference that the Windmere Defendants acted with the requisite state of mind. Plaintiffs allege Defendants made numerous specific, factually based statements that were false or materially misleading. *See* Part I, *supra.* In seeking dismissal, the Windmere Defendants focus on one of many alleged false statements, relating to portions of the May 11 Press Release:

> The combined company will be uniquely positioned to capitalize on growth opportunities within the personal care and kitchen categories. Immediate growth opportunities will result from the combination of innovative product development, marketing capabilities and manufacturing infrastructure.

(Am.Compl. ¶ 30.)

The Court has previously determined various statements either were not forward looking or were not coupled with adequate cautionary language, and thus not protected by the statutory safe harbor. These include: (1) a statement of fact in the August 11 Press Release: "We are ahead of our scheduled plans, the assimilation of the acquisition is going very smoothly . . . ." (Am.Compl. ¶ 65); (2) the partial disclosure in the Registration Statement regarding "price concessions" (*Id.* ¶ 49); and (3) the statements made in the Registration Statement about NewTech (*Id.* ¶ 59). Moreover, the Court finds the June 10 Press Release does not contain meaningful cautionary language identifying the statements as forward looking, and thus cannot fall within the harbor for the specific risks alleged in the Amended Complaint. *See* Part III.A.4, *supra.* Furthermore, the Court notes that the Windmere Defendants' actual knowledge of the falsity of these statements is alleged in Count IV. (*See id.* ¶¶ 93–121.)

■ As the Court has previously analyzed in Part III.A.4, *supra,* these statements were not accompanied by adequate, meaningful, cautionary language that would allow a reasonable investor to understand the nature of the potential risks involved.[8] As alleged, the Windmere Defendants closed on HPG on June 26, 1998 and operated HPG prior to the July Offering. (*See id.* ¶¶ 3, 46(b).) Defendants Friedson and Schulman, Windmere's top management, conducted due diligence on HPG, participated in the preparation of the July Offering, attended road show presentations, and signed the Registration Statement. (*See id.* ¶¶ 3 & 46(b).) The Windmere Defendants allegedly knew as early as March 1998 that HPG products could not be lawfully sold in Latin America without licenses. (*See id.* ¶ 46(a).) In road show presentations after the June 26, 1998 acquisition of HPG, Schulman and Friedson allegedly told the marketplace that Windmere was already in the process of integrating the operations of HPG. (*See id.* ¶ 46.) In July and August 1998, Windmere's General Counsel allegedly sought to accelerate the Latin American licensing process, but without success. (*See id.* ¶ 46(a).) In addition, Plaintiffs allege that at a senior staff meeting in June, 1998, there was a discussion about Windmere's inability to sell additional HPG products to Latin American retailers because they had already been inundated with product prior to the sale of HPG to Windmere. (*See id.* ¶¶ 46(b) & 53.) Moreover, the poor sales at NewTech were allegedly known to Windmere Defendants, and to Defendant Friedson in particular. (*See id.* ¶¶ 20(a) & 62.) Notwithstanding these facts, Defendant Friedson is alleged to have told the marketplace in the August 11 Press Release that "[w]e are ahead of our plans, the assimilation of the acquisition is going smoothly . . . ." (*See id.* ¶ 65.)

■ The Court finds the Amended Complaint adequately alleges there was no basis in fact for this statement, and, under the risks allegedly faced by investors at the time and reasonably foreseeable or discoverable by the Windmere Defendants, this statement was not accompanied by adequate meaningful cautionary language.[9]

The Court finds Plaintiffs have alleged that the Windmere Defendants made: (1) a misstatements or omissions; (2) of material facts; (3) made with scienter; (4) on which Plaintiffs relied; (5) that proximately caused Plaintiffs' injuries. *See Ross,* 885 F.2d at 728. The Court has previously discussed the first two elements, *see* Part III.A.1–2, *supra,* and the Court finds the Complaint adequately alleges the fourth

---

8. Plaintiffs properly point out that Defendants conflate liability of insiders for their statements to analysts versus liability of insiders for statements about their company appearing in reports written by analysts. Statements to analysts are statements to market professionals and may be no different from those in press releases, interviews or corporate reports. These are statements by the Defendants to the market and if material, false and issued with scienter, section 10(b) liability may attach in an appropriate case. *See Provenz v. Miller,* 102 F.3d 1478, 1487–88 (9th Cir.1996); *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir.1996).

9. Plaintiffs allege that Defendants were under enormous pressure to complete the July Offering as quickly as possible, to repay NationsBank for a substantial part of the HPG bridge loan financing. And, Plaintiffs allege both Friedson and Schulman engaged in a sophisticated hedging strategy prior to the Offering that guaranteed the value of their shares would be fixed in a range between $ 21 and $ 33 per share. (*See id.* ¶¶ 8, 106–116.) Alone, these facts would likely not support the allegation of severe recklessness, but under the current standard of review, taking the facts as alleged, the Court finds these factual allegations support the scienter claim relating to the August 11 Press Release.

and fifth elements. The Court further finds that the extreme nature of the alleged material omissions here, combined with the significant underlying facts in the Amended Complaint supporting severe recklessness, establish a claim of scienter here against the Windmere Defendants. The Court finds, however, that fact discovery is necessary before any complete adjudication of the scienter claim may occur.

### 3. Section 10(b) and Rule 10(b)–5 Violations Claims Against Underwriter Not Adequately Pled.

Plaintiffs also seek to establish that Defendant Montgomery, the lead underwriter of the July Offering, acted with the requisite scienter under an "enhanced" "motive and opportunity" test. (*See* Pl. Mem. in Opp'n to Underwriter's Mot. Dismiss at 25). Plaintiffs attempt to bolstering their showing of Montgomery's motive and opportunity through additional use of the terms "recklessly" and "knowingly," without pointing to specific facts in support of their conclusion.

Plaintiffs allege in this claim that Montgomery had knowledge of the licensing issue through due diligence, and thus gained knowledge of material undisclosed adverse information. (Am.Compl.¶ 99.) Plaintiffs allege Montgomery had an incentive to complete the offering quickly because the $ 377 million bridge loan issued to Windmere to complete the sale was made by Montgomery's affiliate, NationsBank. (Am.Compl.¶¶ 3, 117.) Plaintiffs allege that a delay while Windmere obtained the licenses, or otherwise recognized the exact nature of the risk of not obtaining licenses and disclosing this risk to the public, would delay the offering and cost Montgomery's clients, *i.e.*, the Windmere Defendants, significant money under the terms of the loan. As Plaintiffs describe,

[i]mportantly, the affiliates of Montgomery, which loaned in total, $ 377 million to [Windmere] ... were all subsidiaries along with Montgomery of one public company, NationsBank Corp. Thus, Montgomery's motive in recovering the outstanding loans by underwriting the offering is directly linked to the motive of its parent and affiliate companies to collect the outstanding funds. This unique situation places Montgomery in a different position from typical underwriters in public offerings, whose scienter is not normally imputed merely because of underwriting fees.

(Pls. Mem. Opp'n Underwriter's Mot. Dismiss at 25.) Plaintiffs further rely on the factual allegations related to the undisclosed risks described above, and state that the failure to disclose, combined with the "enhanced motive," equate to "severe recklessness" for purposes of stating a scienter claim. (*See id.* at 26 & n. 15.)

Defendant Montgomery argues that Plaintiffs have failed to allege particularized facts demonstrating the it acted with the requisite scienter under section 10–b and Rule 10b–5. First, Montgomery asserts that it may not be held to have acted with severe recklessness based solely on conclusory allegations about its involvement in the due diligence investigation and the July Offering. In addition, Montgomery asserts that allegations of motive and opportunity to commit securities fraud, without more, cannot establish scienter, and, in any event, Plaintiffs have not adequately alleged that Montgomery had a motive and opportunity. (*See* Underwriter's Mot. Dismiss at 9–12.)

In *Bryant*, district courts were admonished to carefully read scienter claims under the "severe recklessness" standard:

While allegations of motive and opportunity may be relevant to a showing of

severe recklessness, we hold that such allegations, without more, are not sufficient to demonstrate the requisite scienter in our Circuit. We quantify scienter as encompassing at least a showing of severe recklessness, and although motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness, we decline to conclude that they, standing alone, are its equivalent[ ]. Motive and opportunity, on the other hand, do not constitute a substantive standard; rather, motive and opportunity are specific kinds of evidence, which along with other evidence might contribute to an inference of recklessness or willfulness.

187 F.3d at 1285–86. Plaintiffs' allegations as to Montgomery's scienter appear solely in paragraph 99 of the Amended Complaint:

> With respect to defendant Montgomery, it knew of or recklessly disregarded the false statements and omissions contained in the Registration Statement. Each of the[ ] defendants; (a) knew or had access to the material adverse nonpublic information about HPG's adverse financial outlook and then existing business conditions, which was [sic] not disclosed; and (b) directly or indirectly participated in drafting, reviewing and/or approving the misleading statements, releases, analyst reports and SEC filings, including Registration Statement [sic] and other public representations of and about Windmere.

(Am.Compl.¶ 99.) It is well-settled, however, that a court may not infer fraudulent intent from an allegation that "a defendant's due diligence investigation 'should have turned up the asserted improprieties in the offering materials.'" *In re WRT Energy Secs. Litig.*, No. 96 Civ. 3610, 1997 WL 576023, at *13 (S.D.N.Y. Sept.15,

1997) (quoting *Eickhorst v. American Completion & Dev. Corp.*, 706 F.Supp. 1087, 1093–94 (S.D.N.Y.1989)); *see Friedman v. Arizona World Nurseries, Ltd.*, 730 F.Supp. 521, 532 (S.D.N.Y.1990), *aff'd*, 927 F.2d 594 (2d Cir.1991). In addition, insofar as Plaintiffs' allegations fail to aver specific facts with respect to Montgomery's scienter, those allegations are conclusory and speculative, and do not provide a sufficient basis from which this Court could conclude that Montgomery acted with severe recklessness. *See Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir.1990); *In re Stratosphere Corp. Secs. Litig.*, 1 F.Supp.2d 1096, 1122 (D.Nev.1998) ("Plaintiffs' allegations regarding the Underwriters' scienter are nothing more than vague generalizations that would be applicable to every underwriter of securities . . . as virtually all underwriters of securities have the type of 'close connection' with a corporate defendant that Plaintiffs generally allege.") Finally, Montgomery is indistinguishable from other underwriters and professionals who have earned fees in securities offerings, but have not been held to possess the requisite scienter based on the receipt of a fee alone. *See Melder v. Morris*, 27 F.3d 1097, 1103 (5th Cir.1994) (holding that to find scienter based on fee allegations alone "would make a mockery of Rule 9(b) by effectively eliminating the scienter requirement as to securities underwriters since all underwriters are, of course, fee seekers"); *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1251–52 (N.D.Cal.1998); *Stratosphere*, 1 F.Supp.2d at 1122.

Therefore, the Court finds, under the *Bryant* standard, that the Amended Complaint contains no more than allegations that Montgomery may have had a motive and an opportunity to commit securities fraud, which, standing alone, are not sufficient to demonstrate that Montgomery possessed the requisite scienter for liabili-

ty under section 10(b) and Rule 10b–5. See id.; Sunbeam, 89 F.Supp.2d at 1337 (quoting Bryant); Zucker v. Sasaki, 963 F.Supp. 301, 306 (S.D.N.Y.1997). Accordingly, Count IV shall be dismissed as to Defendant Montgomery.

## C. Controlling Person Liability Claims Against Individual Defendants

In Counts III and V, Plaintiffs allege controlling person liability against Defendants Schulman and Friedson under section 15 of the '33 Act, 15 U.S.C. § 77o,[10] and section 20(a) of the '34 Act, 15 U.S.C. § 77t(a).[11] Under these two provisions, "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator," and this liability is collectively referred to as "control person liability." Maher v. Durango Metals, Inc., 144 F.3d 1302, 1304 & n. 7 (10th Cir.1998) ("[A]lthough worded differently, the control person provisions of § 15 and § 20(a) are interpreted the same").

These provisions establish "liability for 'controlling persons'—that is, those who exercise control over primary violators of [the 1933 and 1934 Acts]. A necessary element of a [control person liability]

claim is a primary violation[.]" Cooperman v. Individual Inc., 171 F.3d 43, 52 (1st Cir.1999) (citation omitted); see also Klein v. General Nutrition Cos., 186 F.3d 338, 344 (3d Cir.1999) (control person liability "hinges on liability under either § 77k or § 77l"). The Tenth Circuit has held that "to state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." Maher, 144 F.3d at 1304.

The Court has found that Plaintiffs have adequately alleged securities violations against the Windmere Defendants in Counts I, II and IV. Plaintiffs have alleged in the Amended Complaint that Defendant Friedson was Chairman, Chief Executive Officer, and President of Windmere, and that Defendant Schulman was Chief Operating Officer and Chief Financial Officer, at all times relevant to this action. Based on these allegations, the Court finds that Plaintiffs have adequately alleged Defendants Friedson and Schulman were controlling persons and therefore, Plaintiffs have properly stated control person liability claims against Defendants Friedson and Schulman in Counts III and V. See Sunbeam, 89 F.Supp.2d at 1346.

---

**10.** Section 15 of the '33 Act provides:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k [section 11] or 77l [section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

**11.** Section 20(a) of the '34 Act provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

## IV. Conclusion

Through a well-pled complaint, with significant supporting factual assertions, Plaintiffs have stated various securities claims against Defendants. Because the factual allegations of material omissions and misstatements are numerous, and because of the seriousness of the allegations, Plaintiffs have adequately alleged, with the exception of Count IV as to Defendant Montgomery, five counts of violations of the Securities Act of 1933 and the Securities Exchange Act of 1934. For the reasons discussed above, the Windmere Defendants' Motion to Dismiss shall be denied in its entirety, and Defendant Montgomery's Motion to Dismiss shall be granted as to Count IV and denied in all other respects.

It is therefore **ORDERED AND ADJUDGED** as follows:

1. The Motion to Dismiss the Consolidated Amended Class Action Complaint, filed by Defendants Windmere–Durable Holdings, Inc., David M. Friedson and Harry D. Schulman on August 13, 1999 (D.E.# 84) is **DENIED.**

2. The Motion to Dismiss the Consolidated Amended Class Action Complaint, filed by Defendant Nationsbanc Montgomery Securities LLC, August 16, 1999 (D.E.# 85) is **GRANTED** as to Count IV and **DENIED** in all other respects.

3. The Parties' Joint Report and Motion for Entry of Scheduling Order, filed June 23, 1999 (D.E.# 68) is **DENIED.** The Discovery stay is lifted in this case. The parties shall file an amended joint scheduling report in compliance with Southern District of Florida Local Rule 16.1, within twenty days of the date of this Order.